James O. **DRUKER** and Joan S. Druker, Petitioners-Appellants-Cross-Appellees,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent-Appellee-Cross-Appellant.

Nos. 108, 115 and 116, Dockets 82–4063, 82–4065 and 82–4073.

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1982.

Decided Dec. 22, 1982.

Certiorari Denied May 31, 1983. See 103 S.Ct. 2429.

---

James O. Druker, Mineola, N.Y., pro se.

Paula Schwartz Frome, Mineola, N.Y., for petitioner Joan S. Druker.

William French Smith, Atty. Gen., U.S. Dept. of Justice, Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Gary R. Allen, Elaine F. Ferris, Attys., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee-cross-appellant C.I.R.

Before FEINBERG, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge:

We have here an appeal by taxpayers and a cross-appeal by the Commissioner from a judgment after trial before Chief Judge Tannenwald of the Tax Court, 77 T.C. 867 (1981).

I.

The principal issue on the taxpayers' appeal is the alleged unconstitutionality of the so-called "marriage penalty". The issue relates to the 1975 and 1976 income tax returns of James O. Druker and his wife Joan. During the tax years in question James was employed as a lawyer, first by the United States Attorney for the Eastern District of New York and later by the District Attorney of Nassau County, New York, and Joan was employed as a computer programmer. For each of the two years they filed separate income tax returns, checking the status box entitled "married filing separately". In computing their respective tax liabilities, however, they applied the rates in I.R.C. § 1(c) for "Unmarried individuals" rather than the higher rates prescribed by § 1(d) for "Married individuals filing separate returns". Prior to undertaking this course of action, James consulted with the United States Attorney for the Eastern District and with members of the Intelligence Division of the IRS, explaining that he and his wife wanted to challenge the constitutionality of the "marriage penalty" without incurring liability

for fraud or willfulness. Following these conversations they filed their returns as described, attaching to each return a letter explaining that, although married, they were applying the tax tables for single persons because they believed that the "income tax structure unfairly discriminates against working married couples" in violation of the equal protection clause of the fourteenth amendment. The Tax Court rejected this constitutional challenge, sustaining the Commissioner's determination that the Drukers were subject to tax at the rates provided in § 1(d) for married persons filing separately.

Determination of the proper method for federal taxation of the incomes of married and single persons has had a long and stormy history. See generally, Bittker, Federal Income Taxation and the Family, 27 Stan.L.Rev. 1389, 1399–1416 (1975). From the beginning of the income tax in 1913 until 1948 each individual was taxed on his or her own income regardless of marital status. Thus, as a result of the progressive nature of the tax, two married couples with the same aggregate income would often have very different tax liabilities—larger if most of the income belonged to one spouse, smaller as their incomes tended toward equality. The decision in *Poe v. Seaborn*, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930), that a wife was taxable on one half of community income even if this was earned solely by the husband, introduced a further element of geographical inequality, since it gave married couples in community property states a large tax advantage over similarly situated married couples with the same aggregate income in common law states.

After *Poe* the tax status of a married couple in a community property state differed from that of a married couple in a common law state in two significant respects. First, each community property spouse paid the same tax as an unmarried person with one-half the aggregate community income, whereas each common law spouse paid the same tax as an unmarried person with the same individual income. Consequently, marriage usually reduced a couple's tax burden if they resided in a community property state but was a neutral tax event for couples in common law states. Second, in community property states all married couples with the same aggregate income paid the same tax, whereas in common law states a married couple's tax liability depended on the amount of income each spouse earned. See Bittker, *supra,* 27 Stan.L.Rev. at 1408.

The decision in *Poe* touched off something of a stampede among common law states to introduce community property regimes and thereby qualify their residents for the privilege of income splitting. The Supreme Court's subsequent decision in *Commissioner v. Harmon,* 323 U.S. 44, 65 S.Ct. 103, 89 L.Ed. 60 (1944), that the income-splitting privileges did not extend to couples in states whose community property systems were elective, slowed but did not halt this movement. The result was considerable confusion and much upsetting of expectations founded on long experience under the common law. Congress responded in 1948 by extending the benefits of "income splitting" to residents of common law as well as community property states. Revenue Act of 1948, ch. 168, 62 Stat. 110. Pursuant to this Act, every married couple was permitted to file a joint return and pay twice the tax that a single individual would pay on one-half of their total income. This in effect taxed a married couple as if they were two single individuals each of whom earned half of the couple's combined income. The Act not only reduced the tax burden on married couples in common law states; it also ensured that all married couples with the same aggregate income paid the same tax regardless of the state in which they lived ("geographical uniformity") and regardless of the relative income contribution of each spouse ("horizontal equity").

While the 1948 Act was good news for married couples, it placed singles at a serious disadvantage. The tax liability of a single person was now sometimes as much as 41% greater than that of a married couple with the same income. S.Rep. No. 552,

91st Cong., 1st Sess. 260 (1969), U.S.Code Cong. & Admin.News 1969, p. 1645. Although constitutional challenges to the "singles' penalty" were uniformly rejected, see, e.g., *Kellems v. Commissioner,* 58 T.C. 556 (1972), *aff'd per curiam,* 474 F.2d 1399 (2 Cir.), *cert. denied,* 414 U.S. 831, 94 S.Ct. 63, 38 L.Ed.2d 66 (1973); *Faraco v. Commissioner,* 261 F.2d 387 (4 Cir.1958), *cert. denied,* 359 U.S. 925, 79 S.Ct. 606, 3 L.Ed.2d 627 (1959), the single taxpayer obtained some relief from Congress. The Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487 (1969), increased the number of tax schedules from two to four: § 1(a) for marrieds filing jointly; § 1(b) for unmarried heads of households; § 1(c) for unmarried individuals; and § 1(d) for married individuals filing separately.[1] The schedules were set so that a single person's tax liability under § 1(c) would never be more than 120% that of a married couple with the same income filing jointly under § 1(a). See S.Rep. No. 552, *supra,* at 260–62.

The 1969 reform spawned a new class of aggrieved taxpayers—the two wage-earner married couple whose combined tax burden, whether they chose to file jointly under § 1(a) or separately under § 1(d), was now greater than it would have been if they had remained single and filed under § 1(c). It is this last phenomenon which has been characterized, in somewhat loaded fashion, as the "marriage penalty" or "marriage tax".[2] Here, again, while constitutional attack has been unavailing, see *Johnson v. United States,* 422 F.Supp. 958 (N.D.Ind. 1976), *aff'd per curiam sub nom. Barter v. United States,* 550 F.2d 1239 (7 Cir.1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 725, 54

L.Ed.2d 755 (1978); *Mapes v. United States,* 576 F.2d 896 (Ct.Cl.), *cert. denied,* 439 U.S. 1046, 99 S.Ct. 722, 58 L.Ed.2d 705 (1978), as well as the decision here under review, Congress has acted to provide relief. The Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 103, 95 Stat. 172, 187, allows two-earner married couples a deduction from gross income, within specified limits, equal to 10% of the earnings of the lesser-earning spouse.

Subsequent to the decisions in *Johnson* and *Mapes,* the Supreme Court made explicit in *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), what had been implicit in earlier decisions, that the right to marry is "fundamental". The Court, however, citing *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977), took care to explain that it did "not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may be legitimately imposed." 434 U.S. at 386, 98 S.Ct. at 681. Whereas differences in race, religion, and political affiliation are almost always irrelevant for legislative purposes, "a distinction between married persons and unmarried persons is of a different character". *Jobst, supra,* 434 U.S. at 53, 98 S.Ct. at 99. "Both tradition and common experience support the conclusion that marriage is an event which normally marks an important change in economic status." *Id.*

---

1. The rates set under § 1(d) were the pre-1969 rates for single taxpayers. So disadvantageous is this schedule that only about 1% of married couples file separately. Staff of the Joint Committee on Taxation, Report on the Income Tax Treatment of Married Couples and Single Persons, 96th Cong., 2d Sess. 48 (1980). As a general rule, married taxpayers file separately only when they are so estranged from one another that they do not wish to sign a joint return or when separate filing enables one spouse to exceed the 3% of income floor for medical deductions. *Id.* at 9. See Bittker, *supra,* 27 Stan.L.Rev. at 1414.

2. Not all married couples are so "penalized". For the couple whose income is earned primarily or solely by one partner, marriage still offers significant tax savings. As a general rule of thumb, marriage will increase a couple's tax burden as compared with that of two single persons whenever the lesser-earning spouse earns 20% or more of the couple's total income and decrease its tax burden whenever the lesser-earning spouse earns less than 20%. See Gerzog, The Marriage Penalty: The Working Couple's Dilemma, 47 Fordham L.Rev. 27, 28 (1978).

We do not doubt that the "marriage penalty" has some adverse effect on marriage; indeed, James Druker stated at argument that, having failed thus far in the courts, he and his wife had solved their tax problem by divorcing but continuing to live together. The adverse effect of the "marriage penalty", however, like the effect of the termination of social security benefits in *Jobst,* is merely "indirect"; while it may to some extent weight the choice whether to marry, it leaves the ultimate decision to the individual. See generally, Developments in Law—The Constitution and the Family, 93 Harv.L.Rev. 1156, 1255 (1980). The tax rate structure of I.R.C. § 1 places "no direct legal obstacle in the path of persons desiring to get married". *Zablocki, supra,* 434 U.S. at n. 12, 98 S.Ct. at 681 n. 12. Nor is anyone "absolutely prevented" by it from getting married, *id.* at 387, 98 S.Ct. at 681. Moreover, the "marriage penalty" is most certainly not "an attempt to interfere with the individual's freedom [to marry]". *Jobst, supra,* 434 U.S. at 54, 98 S.Ct. at 99. It would be altogether absurd to suppose that Congress, in fixing the rate schedules in 1969, had any invidious intent to discourage or penalize marriage—an estate enjoyed by the vast majority of its members. Indeed, as has been shown, the sole and express purpose of the 1969 reform was to provide some relief for the single taxpayer. See S.Rep. No. 552, *supra,* at 260–261. Given this purpose Congress had either to abandon the principle of horizontal equity between married couples, a principle which had been established by the 1948 Act and the constitutionality of which has not been challenged, or to impose a "penalty" on some two-earner married couples. It was put to this hard choice because, as Professor Bittker has shown, *supra,* 27 Stan.L.Rev. at 1395–96, 1429–31, it is simply impossible to design a progressive tax regime in which all married couples of equal aggregate income are taxed equally and in which an individual's tax liability is unaffected by changes in marital status.[3] See also Tax Treatment of Single Persons and Married Persons Where Both Spouses Are Working: Hearings Before the House Committee on Ways and Means, 92d Cong., 2d Sess. 78–79 (1972) (Statement of Edwin S. Cohen, Assistant Secretary for Tax Policy) ("No algebraic equation, no matter how sophisticated, can solve this dilemma. Both ends of a seesaw cannot be up at the same time."); Note, The Case for Mandatory Separate Filing by Married Persons, 91 Yale L.J. 363, 365 n. 6 (1982) (mathematical proof of the logical inconsistency among progressivity, marriage neutrality, and horizontal equity between married couples). Faced with this choice, Congress in 1969 decided to hold fast to horizontal equity, even at the price of imposing a "penalty" on two-earner married couples like the Drukers. There is nothing in the equal protection clause that required a different choice. Since the objectives sought by the 1969 Act—the maintenance of horizontal equity and progressivity, and the reduction of the differential between single and married taxpayers—were clearly compelling, the tax rate schedules in I.R.C. § 1 can survive even the "rigorous scrutiny" reserved by *Zablocki* for measures which "significantly interfere" with the right to marry. Cf. *Johnson, supra,* 422 F.Supp. at 973–74. Clearly, the alternative favored by the Drukers, that married persons be permitted to file under § 1(c) if they so wish, would entail the loss of horizontal equity.

In the area of family taxation every legislative disposition is "virtually fated to be both overinclusive and underinclusive when judged from one perspective or another". The result, as Professor Bittker has well said, is that there "can be no peace in this area, only an uneasy truce." 27 Stan.L. Rev. at 1443. Congress must be accorded

---

**3.** Professor Bittker puts it thus, 27 Stan.L.Rev. at 1430–31:

Another way to describe this collision of objectives is that the tax paid by a married couple must be (a) greater than they paid before marriage, in which event they are subject to a marriage penalty, (b) less than they paid before marriage, in which event unmarried persons are subject to a singles penalty, or (c) unchanged by marriage, in which event equal-income married couples are subject to unequal taxes.

wide latitude in striking the terms of that truce. The history we have reviewed makes clear that Congress has worked persistently to accommodate the competing interests and accomplish fairness. While we could elaborate still further, we think that this, along with the discussion in *Johnson, Mapes,* and in Chief Judge Tannenwald's opinion below, is sufficient to show that what the Drukers choose to call the "marriage penalty" deprived them of no constitutional right. Whether policy considerations warrant a further narrowing of the gap between the schedules applied to married and unmarried persons is for Congress to determine in light of all the relevant legislative considerations.

## II.

The Drukers contend that if their constitutional argument does not prevail, they should at least have been permitted to make a late filing of a joint return for 1976 under I.R.C. § 6013(b), and thereby reduce the deficiency from the excess of the § 1(d) over the § 1(c) rates to the considerably smaller excess of the § 1(a) over the § 1(c) rates.

I.R.S. § 6013(b)(1) states the general rule to be:

Except as provided in paragraph (2), if an individual has filed a separate return for a taxable year for which a joint return could have been made by him and his spouse under subsection (a) and the time prescribed by law for filing the return for such taxable year has expired, such individual and his spouse may nevertheless make a joint return for such taxable year.

This switching privilege, however, is sharply limited by § 6013(b)(2) which provides, so far as here pertinent:

The election provided for in paragraph (1) may not be made—

(A) unless there is paid in full at or before the time of the filing of the joint return the amount shown as tax upon such joint return; or

(B) after the expiration of 3 years from the last date prescribed by law for filing the return for such taxable year (determined without regard to any extension of time granted to either spouse); or

(C) after there has been mailed to either spouse, with respect to such taxable year, a notice of deficiency under section 6212, if the spouse, as to such notice, files a petition with the Tax Court within the time prescribed in section 6213 . . . .

The deficiency notices for both 1975 and 1976 were mailed on April 13, 1979. On April 24 James Druker had a conversation with IRS Agent Spell which was memorialized in a letter from Druker of that date. At trial Druker was prevented from testifying as to what Agent Spell advised him in this conversation because the judge erroneously sustained an objection by counsel for the Commissioner that the statement of the IRS agent was inadmissible hearsay.[4] All that Druker's April 24 letter shows is that the agent had agreed to return the Drukers' files to audit for a recomputation of the deficiencies based on a joint filing status. A later letter from Druker, while confirming the correctness of the recomputations made in supplemental reports of the Audit Division and agreeing to pay the sums there shown in the event their Tax Court petition proved unsuccessful, stated that the Drukers could not sign the reports since this would waive their right to contest the "marriage tax" before the Tax Court.

The Drukers now contend that this episode estops the Commissioner from refusing to accord them the benefit of joint filing for 1976 should their constitutional claim fail. They make no such connection with respect to their 1975 returns, presumably because the 3-year period prescribed by § 6013(b)(2)(B) had expired some nine days before the April 24, 1979, conversation with Agent Spell.

The Drukers' briefs shift uneasily between asserting that Agent Spell had represented that the supplemental report of

---

4. The statement of the Agent was not "offered in evidence to prove the truth of the matter asserted", FRE 801(c), but was offered simply to show that the agent said whatever she did.

the Audit Division relieved the Drukers of the need to file a formal amended joint return under § 6013(b)(1) and that she had assured them that the Commissioner had also agreed to waive the provision in § 6013(b)(2)(C) which withdraws the switching privilege after deficiency notices have been mailed if the taxpayer files a timely petition with the Tax Court. If the agent's alleged representation was only the former, which is the maximum fairly inferable from Druker's letters, it would avail the taxpayers nothing since, under § 6013(b)(2)(C), the filing of a timely petition with the Tax Court would annul any election of joint status, by formal amended return or otherwise, made after April 13, 1979, the date on which the deficiency notices were mailed. See *Jacobson v. Commissioner,* 73 T.C. 610 (1979). But even if Agent Spell's representation had been the latter, which we think exceedingly unlikely in view of Druker's failure to mention this in his confirmatory letter of April 24, 1979, the case would still be a long way from what is required to meet the standards for invoking an estoppel against the Government enunciated in *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), and the other decisions of the Court there cited.

Beyond all this, we do not see why the issue is not resolved against the taxpayers in any event by § 6013(b)(2)(A), since they nowhere assert that the agent orally relieved them of the requirement of payment "in full at or before the time of the filing of the joint return". However, since the Tax Court did not mention this point and the Commissioner relegates it to a footnote in his brief, we have not relied upon it here.

### III.

■ With respect to the disallowance of the home office or storage deduction claimed by James O. Druker for 1976, we can do no better than quote the opinion of the Tax Court, 77 T.C. at 874:

The record is clear that he has failed to satisfy the requirements of section 280A, which governs this deduction. He was an

employee over the course of the year and has made no showing that the office was used for the convenience of his employer. Sec. 280A(c)(1). Moreover, he reported no income which might have been derived from a separate trade or business for which he may have used the room as the principal place of business. Thus, section 280A(c)(5) also precludes this deduction.

Rather than argue that he is entitled to a deduction for a home office, James contends that the room was used as a storage facility for his law library and files, in lieu of renting a separate warehouse. Since he was not in the trade or business of selling products at wholesale or retail, however, he is not entitled to a home storage deduction. Sec. 280A(c)(2).

### IV.

■ We come finally to the Commissioner's cross-appeal from the Tax Court's refusal to impose a 5% addition for "intentional disregard of rules and regulations" under I.R.C. § 6653(a). This section provides:

Negligence or intentional disregard of rules and regulations with respect to income or gift taxes.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

See also Treas.Reg. § 301.6653–1(a) (incorporating the statutory language). In computing their respective tax liabilities the Drukers applied the rates in I.R.C. § 1(c) for "Unmarried individuals" instead of the higher rates prescribed by § 1(d) for "Married individuals filing separate returns" as the regulations required. There was, to be sure, nothing furtive or fraudulent in this; they checked the "married filing separately" status box on their returns, cross-referenced the returns by providing each other's Social Security number, and attached to

each return a letter explaining what they were doing and why. Nevertheless, the record leaves no doubt that in using rate schedules applicable only to unmarried persons, they intentionally violated Section 1 of the Code and the rules and regulations promulgated thereunder, see Treas.Reg. § 1.1–1(a).

While conceding that the Drukers acted "deliberately and in open disregard of the requirements of the statute", the Tax Court nonetheless disallowed the 5% addition on the ground that the Drukers' "position herein is not so frivolous and meritless as to fall within the ambit of numerous cases involving even sincere taxpayers where the addition to the tax under section 6653(a) has been imposed", that "it is common knowledge that the 'marriage penalty' has been the subject of widespread comment and discussion, including extensive legislative consideration",[5] and that "[a]ccordingly [the Drukers] should not be penalized for seeking to litigate the issue." 77 T.C. at 875. We think the Tax Court took unto itself a dispensing power not granted by Congress.

The statutory language, "there shall be added", could hardly be clearer. The reasonableness of a taxpayer's action may indeed be relevant when he is charged with negligence but not when he admittedly has flouted applicable rules and regulations which he fully understood. Departure from the natural and ordinary meaning of the words, whose literal application does not result in any manifestly absurd or unfair

result, could be justified only if there were other evidence that the over-all purpose of Congress would be better served by such a reading. We find no sufficient evidence of this.

The five percent addition in § 6653(a) for "intentional disregard of rules and regulations" derives from § 250(b) of the Revenue Act of 1921. 42 Stat. 265. Its appearance on the statute books at that time could hardly have been fortuitous. The very same Act provided in § 250(d) that a taxpayer notified of a deficiency must be "given a period of not less than 30 days ... to file an appeal and show cause or reason why the ... deficiency should not be paid". 42 Stat. 266. Though in some ways imperfect,[6] this prepayment remedy was thoroughly revolutionary. Hitherto, a taxpayer had been required, on pain of distraint, to pay any deficiency assessed within ten days of notice and demand. See S.Rep. No. 275, 67th Cong., 1st Sess. 20–21 (1921). The collector's assessment had "the force of a judgment, and if the amount assessed [was] not paid when due, administrative officials [could] seize the debtor's property to satisfy the debt". *Bull v. United States,* 295 U.S. 247, 259–60, 55 S.Ct. 695, 699–700, 79 L.Ed. 1421 (1935). Only after full payment of the amount assessed could the taxpayer bring a suit for a refund in the district court or Court of Claims. 24 Stat. 505 (current version at 28 U.S.C. §§ 1346, 1491). See *Flora v. United States,* 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960).

---

**5.** We do not grasp the force of this. Many tax issues, e.g., whether capital gains should be taxed and, if so, what the rate and the holding period should be; the alleged "double taxation" of so much of corporate profits as is declared as dividends; indexing of income to avoid "bracket creep" due to inflation, etc., have likewise been and doubtless will continue to be discussed for years. The Tax Court could hardly have meant that persons sincerely entertaining views on such matters differing from the legislators' could resort to self-help without incurring the 5% addition to the tax. If the distinction is thought to be that the Drukers raised constitutional and not mere policy objections, there is no showing of widespread discussion of that. Moreover the generous attitude of the Tax Court presumably would have

to carry over to persons who sincerely dispute the legality of their being subjected to income taxation to support activities such as the Vietnam war or nuclear armament of which they strongly disapprove and who make fully disclosed deductions from their taxes on that account.

**6.** Appeal was to the Committee on Appeals and Review, established by the Commissioner within the Internal Revenue Bureau. Dissatisfaction with this arrangement led in short order to the creation of an independent Board of Tax Appeals. Revenue Act of 1924, § 900, 43 Stat. 336 (1924). See H.R.Rep. No. 179, 68th Cong., 1st Sess. 7–8 (1924).

It was altogether natural that Congress, in relieving taxpayers of the harsh necessity of making payment first and then seeking refund in the courts and in enabling them to avoid the Government's power of distraint, should take care that the collection of taxes not be unduly delayed. The addition of 5 percent whenever underpayment was due to "intentional disregard of authorized rules and regulations", 42 Stat. 265, was doubtless designed in good part to deter taxpayers from abusing the new remedy by intentionally underpaying and then contesting the deficiency assessed.[7] Taxpayers who wished to test the validity of rules and regulations without risking the 5 percent addition were not left without recourse; they could still pay the tax shown to be due and then sue for a refund.

It is thus not surprising that the Board of Tax Appeals, in what appears to have been its first clear encounter with the problem, held in a thoroughly considered opinion that "[h]arsh though the conclusion may seem", the 5 percent addition was mandatory even where the taxpayer had reasonably believed, on the advice of counsel, that a regulation issued by the Commissioner was invalid. *The Journal Co. v. Commissioner,* 46 B.T.A. 841, 845–46 (1942), *rev'd on other grounds,* 134 F.2d 165 (7 Cir.1943). Taxpayers have not cited to us any case prior to the instant one in which the Board of Tax Appeals, the Tax Court, or any reviewing court has ever departed from the rule announced in *The Journal Co.* The cases cited by taxpayers are all distinguishable. They relied on the fact that the taxpayers themselves did not know what they were doing, *Hill v. Commissioner,* 63 T.C. 225, 251–52 (1974); *Bennett v. Commissioner,* 139 F.2d 961, 966–67 (8 Cir.1944); or believed, albeit erroneously, that what they had done complied with the regulations, *Commissioner v. S.A. Woods Mach. Co.,* 57 F.2d 635 (1 Cir. 1932); *Brockman Building Corp. v. Commissioner,* 21 T.C. 175, 191 (1953); *Scott v. Commissioner,* 61 T.C. 654 (1974), or had

been charged merely with negligence, *Miller v. United States,* 211 F.Supp. 758 (D.Wyo.1962). The dicta in *Marcello v. Commissioner,* 380 F.2d 499, 506 and n. 20 (5 Cir.1967), do not support a broad "reasonable basis" exception of the sort urged by taxpayers. Indeed, *Marcello* cites *The Journal Co., id.,* at n. 21, without any intimation that it does not state the correct rule.

The history of the 1954 Code, referred to but not discussed by the Tax Court, tends to confirm the desire of Congress to leave the construction adopted in *The Journal Co.* undisturbed. The Senate Finance Committee proposed an amendment which would have provided that the 5% addition not be applied " . . . where a taxpayer in good faith intentionally disregards rules and regulations because he reasonably believes the rules or regulations are invalid and attaches to his return an adequate statement which sets forth the rules or regulations disregarded and the grounds for believing them invalid." S.Rep. No. 1622, 83d Cong., 2d Sess. at 591, *reprinted in* [1954] 3 U.S.Code Cong. and Ad.News 4621, 5240. This amendment was deleted in conference. H.R.Conf.Rep. No. 2543, 83d Cong., 2d Sess. at 80, *reprinted in* [1954] 3 U.S.Code Cong. and Ad.News 5280, 5342. No explanation for the deletion was given. Although other interpretations are possible, the most reasonable is that in 1954 Congress was satisfied with the language of the statute as construed in *The Journal Co.* and other cases decided up to that time and did not wish to allow the very exception asserted by taxpayers here.

Against this the taxpayers rely on I.R.C. § 6694(a), enacted as part of the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520. This imposes a $100 penalty on a tax preparer for any return or refund on which an understatement of tax liability is caused by his intentional or negligent disregard of rules and regulations. While the

---

7. Sec. 250(b) of the Revenue Act of 1918 had imposed a 5% addition where "the understatement is due to negligence". 40 Stat. 1083. The 1921 Act amended § 250(b) to provide that the

5% addition be imposed as well where the deficiency is due to "intentional disregard" of rules and regulations. 42 Stat. 265.

pertinent language of the statute itself is virtually identical to § 6653(a), the Treasury regulation promulgated thereunder, § 1.6694–1(a)(4), unlike the regulation under § 6653(a), see § 301.6653–1(a), expressly provides for a "reasonable basis" exemption: "If a preparer in good faith and with reasonable basis takes the position that a rule or regulation does not accurately reflect the Code and does not follow it, the preparer has not negligently or intentionally disregarded the rule or regulation". More important, the regulation provides further that: "This test [the reasonable basis test] shall be applied in the same manner as it is applied under section 6653(a) and the regulations thereunder (relating to disregard of rules and regulations by taxpayers)." The wording of this regulation appears to derive directly from Congressional committee reports on the 1976 Act. The House Report stated that:

> The penalty [for tax preparers] applies generally to every negligent or intentional disregard of ... rules and regulations except that a good faith dispute by an income tax return preparer about an IRS interpretation of a statute (expressed in regulations or rulings) is not considered a negligent or intentional disregard of rulings and regulations. The provision is thus to be interpreted in a manner similar to the interpretation given the provision under present law (sec. 6653(a)) relating to the disregard of IRS rules and regulations by taxpayers on their own returns.

H.Rep. No. 658, 94th Cong., 1st Sess. 278 (1975), U.S.Code Cong. & Admin.News 1976, pp. 2897, 3174. See also, Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, 94th Cong., 2d Sess. at 351.

The Commissioner concedes that this suggests that the 1976 Congress believed the 'intentional disregard' language of § 6653(a) to be also subject to a reasonable basis limitation. Brief at 44. He seeks to avoid the effect of this, however, on the grounds that, as discussed above, Congress in 1954 specifically declined to adopt such a limitation when it enacted § 6653(a) and that "the views of a subsequent Congress

form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960). There is force in the Commissioner's argument. The Congressional decision in 1954 not to adopt a "reasonable basis" exception represented the deliberate and considered action of a conference committee with respect to the very provision here at issue. The 1976 episode, apart from being another 22 years down the road, consisted of talk about § 6653(a) incident to enactment of a new section of the tax law in a committee report which few members may have seen. When all is said and done, the most that the 1976 episode could be taken as proving is that some members of the 94th Congress were mistaken as to the long settled construction of what is now § 6653(a) and that the Commissioner in his regulations adopted the statement in the legislative history. Much more than this is needed to overturn a construction settled since 1942.

More important, even if we were to assume for argument's sake only that the reasonable basis limitation of § 6694(a), as expounded in the legislative history and Treas.Reg. § 1.6694–1(a)(4), could properly be read into § 6653(a), this would not help the Drukers. For their position is not that a "rule or regulation does not accurately reflect the Code", § 1.6694–1(a)(4), but rather that Section 1 of the Code is inconsistent with the Constitution. There is nothing in the legislative history of § 6694(a) or in the language of the Treasury regulation promulgated thereunder to suggest that the 1976 Congress believed that a reasonable basis limitation applies in such a case. On the contrary, the House Report and the Joint Committee Explanation of the 1976 Act both clearly stated that a tax return preparer is to enjoy the benefit of the reasonable basis exemption only where the dispute is "about an IRS interpretation of a statute". H.Rep. No. 658, *supra,* at 278, U.S.Code Cong. & Admin. News 1976, p. 3174; Joint Committee Explanation, *supra,* at 351. A fortiori, a taxpayer who has intentionally disregarded a

rule or regulation can not claim the benefit of any such exemption where, as here, his dispute is with Congress rather than the IRS. We assume that if the Commissioner *desires* to adopt a regulation under § 6653(a) or to take other action which would exempt persons like the Drukers from the 5% addition to tax, he is free to do so. Absent this, when the Commissioner seeks the additional 5% tax and the facts show such an intentional although honest disregard of the statute as here, the courts have no dispensing power.

On the taxpayers' appeal the judgment against them is affirmed; on the Commissioner's appeal the judgment refusing to assess the additional 5% required by § 6653(a) is reversed and the case is remanded for the making of an additional assessment.