Richard A. CRAMER; Alice D. Cramer; Warren K. Boynton; Susi M. Boynton; Kevin P. Monaghan; Dina A. Monaghan, Petitioners–Appellants,

v.

COMMISSIONER, INTERNAL REVENUE SERVICE, Respondent–Appellee.

No. 94–70066.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1995.

Decided Sept. 11, 1995.

Michael I. Saltzman, Baker & McKenzie, New York City, for petitioners-appellants Cramer and Boynton.

Robert K. Smith, Robert F. Dailey, Smith & Dailey, La Jolla, CA, for petitioners-appellants Monaghan.

Gary R. Allen, Gilbert S. Rothenberg, Charles Bricken, United States Department of Justice, Tax Division, Washington, DC, for respondent-appellee.

Before: LAY,* BRUNETTI, and RYMER, Circuit Judges.

BRUNETTI, Circuit Judge:

Richard and Alice Cramer, Warren and Susi Boynton, and Kevin and Dina Monaghan appeal from a decision of the Tax Court upholding deficiencies and various penalties assessed by the Commissioner of Internal Revenue against their 1982 federal income tax payments. We have jurisdiction pursuant to I.R.C. § 7482(a), and we affirm.

## FACTS AND PROCEEDINGS BELOW

In 1972, Richard Cramer founded IMED Corp., a company that designed, manufactured and sold electronic medical instruments. Cramer served as president and chief executive officer of IMED from its inception until 1982. During that time, Warren Boynton served as vice-president, and Kevin Monaghan, an attorney, served as outside general counsel. All three also served at various times on the board of directors of IMED.

From 1978 to 1981, the stock of IMED was neither publicly traded on an established exchange, nor registered with the Securities and Exchange Commission. During that time, that stock was held by approximately 150 to 250 shareholders. In 1978, IMED issued to Cramer an option to purchase 50,000 shares of IMED stock at $50 per share. The terms of the option provided certain vesting restrictions: Cramer could only exercise the option in 20% increments in each of the next five years, and only so long as he remained employed by IMED. The terms also provided certain transfer restrictions: Cramer could only transfer the option to persons approved by the board as "qualified offerees," and any transferee would take the option subject to the vesting restrictions.

In 1979, IMED issued to Cramer an option to purchase 4390 shares of IMED stock at $8 per share, to Boynton an option to purchase 30,000 shares of IMED stock at $13 per share, and to Monaghan an option to purchase 4500 shares at $13 per share. All of these options provided for a five year vesting schedule and were subject to the same vesting and transfer restrictions as Cramer's 1978 option.

In 1981, on the advice of Monaghan, IMED and Privaco Trust Services S.A., as trustee, entered into a stock option trust agreement. The named beneficiaries included Cramer, Boynton, Monaghan and the other directors of IMED. In 1981, IMED issued to the trustee an option to purchase 325,000 paired shares of IMED stock at various prices. The terms of the option provided that the trustee could not transfer the option except to a beneficiary. Those terms also provided that the option could only be exercised in ⅓ increments in 1983, 1984 and 1985. A separate agreement among the beneficiaries of the trust provided that each beneficiary could be divested of his allocable share of the option if he were no longer employed by IMED on the vesting dates.

IMED issued all of these options in recognition of the services Cramer, Boynton and Monaghan provided to the company. The delayed vesting schedules and restrictions were intended to induce their continued employment with IMED. Appellants never exercised any part of the options.

In 1978, Dan Hendrickson, the corporate comptroller and treasurer of IMED, consulted with an accountant at Arthur Young & Co. regarding the tax treatment of these options. The accountant did not actually review the IMED options. Nonetheless, he informed Hendrickson that as a general matter, I.R.C. § 83(b) elections could be filed to

* Hon. Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

include the value of so-called "nonstatutory options" (options not subject to I.R.C. § 422), such as the IMED options, in ordinary income at the time of grant, even if they were not publicly traded, and that the options would then receive capital gains treatment upon later disposition.

On the basis of that information, as well as his own research, Hendrickson advised Cramer, Boynton and Monaghan that on the one hand, statements in the legislative history of the 1976 Tax Reform Act arguably supported treating the IMED options in this manner. He told them that in order to have a chance at receiving capital gain treatment upon future disposition of the options, they would have to file § 83(b) elections with the Internal Revenue Service to include their value in ordinary income in the year of grant. But he told them that on the other hand, under Treasury regulations, he believed that the value of the options could not be readily ascertained upon grant. If that were the case, § 83 would not apply at grant at all. He advised them that pursuant to those regulations, the IRS could take the position that the options would not receive capital gains treatment upon future disposition. He further informed them that acting contrary to or overturning a Treasury regulation "is very difficult."

In an attempt to ensure capital gain treatment upon future disposition of the options, appellants filed § 83(b) elections with the IRS for Cramer's 1978 option, Boynton's 1979 option and Monaghan's 1979 option. The elections stated that the fair market value of the options at the date of grant was zero. No such elections were filed either for Cramer's 1979 option or for the 1981 option issued to the trust. Appellants reported no taxable income in the year of grant from the receipt of any of the options.

Despite filing elections declaring that the options had zero value, Cramer believed that the options had a value greater than zero upon grant. Boynton believed that options had value upon grant, but that it was not "readily recognizable value." Appellants did not consult an expert on options or valuation before they claimed that value as zero.

In 1981, John Stine of Arthur Young began handling IMED's tax matters. At that time, appellants inquired whether the statute of limitations on their treatment of the options would run from the time when they filed the § 83(b) elections. Stine determined that it would not, and also sent a letter to Monaghan stating:

> IMED currently takes the position that its stock options are governed by Section 83 and therefore the present tax treatment is ... no income to the employee on grant or exercise and no compensation deduction to IMED. However, Regulation 1.83–7 states that an option must have a "readily ascertainable fair market value" before § 83 will apply. Since the definition of "readily ascertainable fair market value" is virtually impossible to meet, IMED's present position is subject to challenge.

He suggested that IMED consider changing its position in light of the potential exposure to exercising employees, should the IRS successfully assert the nonapplication of § 83 at grant. Monaghan discussed Stine's letter with Cramer.

In 1982, Warner–Lambert Corp. purchased all of the stock of IMED for approximately $163 per share. As part of the agreement, the officers and directors of IMED resigned. Warner–Lambert also agreed to buy all outstanding vested and nonvested options on IMED stock. Warner–Lambert paid appellants approximately $163 less the exercise price for each option. Cramer received $25,945,506 for all of his options; Boynton received $7,714,800 for his options; and Monaghan received $2,273,895 for his.

Tax professionals prepared all of appellants' 1982 federal income tax returns. Those professionals informed appellants that they had a plausible position that gain on the options was capital gain, but that Treasury regulations were to the contrary. They said that there was a risk the IRS would reach a contrary conclusion.

Richard and Alice Cramer's joint 1982 income tax return reported all but $1.3 million of the receipts from the options as long-term capital gain. The sale of the options was set out in a section of the return designated for stocks and bonds, even though the return

contained another section for options. Furthermore, even though Richard Cramer knew they had no basis in the options, the return misreported the options as having a basis of $7,535,620 and sales proceeds of $32,181,126.

Warren and Susi Boynton's joint 1982 income tax return declared all receipts from sale of the options as long-term capital gain. It listed the options as "IMED stock" with a zero basis. Kevin and Dina Monaghan's joint 1982 return also declared all receipts from the sale of the options as long-term capital gain. Even though Kevin Monaghan knew they had no basis in the options, their return misreported the options as having a basis of $2,558,500 and sales proceeds of $4,832,395.

None of the returns disclosed that the options were subject to transfer and vesting restrictions; that § 83(b) elections had been filed with respect to some of the options; that the options were not traded on an established market; or on what authority appellants relied to support their treatment of the options.

The IRS audited appellants' 1982 returns. It determined that the sale of the options produced ordinary income in 1982, not capital gain, and calculated deficiencies accordingly. It also assessed penalties against appellants for intentional disregard of tax rules and regulations, pursuant to I.R.C. § 6653(a), and for substantial understatement of tax, pursuant to I.R.C. § 6661(a).

Appellants challenged these determinations in United States Tax Court. After a full trial, in a published decision, *Cramer v. Commissioner*, 101 T.C. 225, 1993 WL 369030 (1993), the Tax Court upheld Treas. Reg. § 1.83–7(b)(2) as a valid interpretation of I.R.C. § 83. Under that regulation, because the IMED options were subject to various restrictions at the time of grant, they did not have a "readily ascertainable fair market value" within the meaning of § 83(e)(3). § 83(a) and (b) therefore did not apply to the options at grant, and thus their value was not includable in ordinary income in the year of grant. Accordingly, none of the gain from their subsequent sale in 1982 was taxable as capital gain, and the court

upheld the Commissioner's determination of deficiency. The court also found that appellants had intentionally disregarded Reg. § 1.83–7(b)(2), and therefore upheld the penalty assessed pursuant to § 6653(a). It also found that appellants had substantially understated their tax, that they had no substantial authority to support their tax treatment of the options, that they had not disclosed the facts relevant to that treatment on their returns, and that they had not acted in good faith. On those grounds, it upheld the penalty assessed pursuant to § 6661(a). The Cramers, Boyntons and Monaghans timely appeal.

## DISCUSSION

### I. The Deficiencies in Appellants' 1982 Tax Payments

This case requires us to analyze I.R.C. § 83. That section provides:

**Property transferred in connection with performance of services**

(a) **General Rule.**—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable....

(b) **Election to include in gross income in year of transfer.**—

(1) **In general.**—Any person who performs services in connection with which

property is transferred to any person may elect to include in gross income, for the taxable year in which such property is transferred, the excess of—

(A) the fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse), over

(B) the amount (if any) paid for such property.

If such election is made, subsection (a) shall not apply with respect to the transfer of such property ...

**(c) Special Rules.**—For purposes of this section—

**(1) Substantial risk of forfeiture.**—The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

**(2) Transferability of property.**—The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture....

**(e) Applicability of section.**—This section shall not apply to—

.     .     .     .     .

(3) the transfer of an option without a readily ascertainable fair market value ...

## A. The 1978 and 1979 Options

Appellants argue that under § 83(e)(3), the 1978 and 1979 IMED options had a "readily ascertainable fair market value" at the time of transfer, and that therefore § 83 applied to the transfer of those options. They filed § 83(b) elections with the IRS to include the value of the 1978 Cramer option and the 1979 Boynton and Monaghan options in ordinary income in the year of transfer.[1] While they no longer maintain that those options had

zero value upon grant, they argue that, pursuant to § 83(b), the value of those options (determined without regard to any restrictions) was taxable as ordinary income in the year of transfer, and that any subsequent appreciation in value was taxable as capital gain upon sale in 1982. *See* Boris I. Bittker & Martin J. McMahon, Jr., *Federal Income Taxation of Individuals* ¶ 37.4, at 37–24 (1988).

The Commissioner argues that those options did not have a "readily ascertainable fair market value" at the time of transfer, and that therefore, under § 83(e)(3), § 83 did not apply at the time of transfer. According to this analysis, the transfer of the options was a nontaxable event, § 83 applied only when appellants sold the options in 1982, *see* Treas.Reg. § 1.83–7(a), and the proceeds were taxable entirely as ordinary income. *See id.*; I.R.C. § 83(a).

Thus, the issue presented by this case is whether, at the time of the original transfer, the options had a "readily ascertainable fair market value," within the meaning of I.R.C. § 83(e)(3). Treasury has issued a regulation defining this standard. That regulation provides that an option that is not traded on an established market, such as the IMED options,

does not have a readily ascertainable fair market value when granted unless the taxpayer can show that *all* of the following conditions exist:

(i) The option is transferable by the optionee;

(ii) The option is exercisable immediately in full by the optionee;

(iii) The option or the property subject to the option is not subject to any restriction or condition ... which has a significant effect upon the fair market value on the option; and

(iv) The fair market value of the option privilege is readily ascertainable in ac-

---

**1.** Cramer did not file a § 83(b) election with respect to his 1979 option, and therefore cannot argue that its value was taxable as ordinary income in 1979 pursuant to that subsection. Nor has he argued to us that its value was taxable as

ordinary income in any year prior to 1982 pursuant to § 83(a). Regardless of any such argument that he could have made, for the reasons described below, we conclude that § 83 did not apply to that option until its sale in 1982.

cordance with paragraph (b)(3) of this section.

Treas.Reg. § 1.83–7(b)(2) (emphasis added).

■ The 1978 and 1979 IMED options clearly did not meet all four of these conditions at the time of transfer, and therefore did not have a "readily ascertainable fair market value" according to this regulation. Because the options could not be exercised unless the original recipient remained employed at IMED, the options were subject to "substantial risk of forfeiture." *See* I.R.C. § 83(c)(1). The terms of the options also required that if they were transferred, the transferee must take the options subject to this risk. Thus, the options were not "transferable" within the meaning of the statute. *See* I.R.C. § 83(c)(2). Moreover, the five year vesting schedule rendered them not "exercisable immediately in full" upon grant. Finally, appellants do not seriously challenge the Tax Court's factual finding that the transfer and vesting restrictions had a "significant effect upon the fair market value on the option[s]." We need not address whether the fourth condition was satisfied, because, even though appellants presented evidence below that the value of each IMED "option privilege" was ascertainable, these options so clearly failed the first three conditions. Therefore, according to Reg. § 1.83–7(b)(2), the value of the options was not readily ascertainable at the time of transfer, § 83 did not apply to that transfer, and the gain from the 1982 sale of those options was ordinary income, not capital gain.

Rather than contest this analysis, appellants argue that Reg. § 1.83–7(b)(2) is simply an invalid interpretation of I.R.C. § 83. They point out that § 83(a) and (b) both require that all lapsing restrictions, such as those listed in Reg. § 1.83–7(b)(2)(i–iii), be disregarded when valuing an option for purposes of calculating the tax. They argue that such restrictions should also be disregarded when determining whether an option has a "readily ascertainable fair market value" within the meaning of § 83(e)(3). Since, rather than disregarding those restrictions, Reg. § 1.83–7(b)(2) mandates that such restrictions prevent an option from satisfying the § 83(e)(3) test, appellants argue it is invalid.

■ The Tax Court determined that the regulation was valid. That decision depended upon the court's interpretation of the Internal Revenue Code, which we review de novo. *Williamson v. Commissioner,* 974 F.2d 1525, 1529 (9th Cir.1992). However, we will uphold a Treasury regulation if it "implement[s] the congressional mandate in some reasonable manner," *National Muffler Dealer's Ass'n v. United States,* 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519 (1979), and is not "plainly inconsistent" with the Code. *Bingler v. Johnson,* 394 U.S. 741, 750–51, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969).

■ We conclude that Reg. § 1.83–7(b)(2) is neither plainly inconsistent with, nor an unreasonable interpretation of, § 83. The plain meaning of the statute supports Treasury's interpretation. § 83(a) and (b) both contain language requiring that the value of transferred property be "determined without regard to any restriction. . . ." This language is conspicuously absent from § 83(e)(3). Adoption of appellants' argument would require us to read that language into § 83(e)(3). It is a fundamental rule of statutory construction that "[w]hen Congress includes a specific term in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded." *Arizona Elec. Power Co-op., Inc. v. United States,* 816 F.2d 1366, 1375 (9th Cir.1987) (citing *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)).

Furthermore, Congress has had opportunity to include such language in § 83(e)(3), or otherwise to amend the statute in order to insure that § 83 applies to options subject to restrictions, but it has failed to do so. Reg. § 1.83–7(b)(2), which became effective in 1978, adopted the definition of "readily ascertainable fair market value" contained in Treas.Reg. § 1.421–6(c)(3)(i), which became effective in 1961. When Congress enacted § 83 in 1969, it was aware of Treasury's definition of that standard. *See Pagel, Inc. v. Commissioner,* 91 T.C. 200, 216, 1988 WL 81469 (1988), *aff'd,* 905 F.2d 1190, 1192 (8th

Cir.1990) (concluding that Reg. § 1.83–7(b)(2) is a valid interpretation of the statute). Nonetheless, when Congress included this standard in § 83(e)(3), it did not indicate that restrictions should be disregarded for purposes of that subsection.

Since the enactment of § 83, Congress has passed the Tax Reform Act of 1976, which applied § 83 to "statutory" options previously controlled by I.R.C. § 422. The Senate Finance Committee version of the 1976 bill included an amendment to § 83 that would have allowed taxpayers to elect to include the value of an option in income in the year of grant, even if its fair market value was not readily ascertainable. S.Rep. No. 938, 94th Cong., 2d Sess. 164 (1976), U.S.C.C.A.N.1976, pp. 2897, 3596, *reprinted in*, 1976–3 Internal Revenue Cumulative Bulletin [C.B.] (vol.3) 49, 202. This proposal would have insured that § 83(b) applied upon grant to restricted options as well as to other difficult to value options. It was not enacted. Therefore, since Congress has failed to require that § 83 applies to restricted options upon grant, we will not do so by implication.

Appellants cite legislative history from the 1976 Tax Reform Act to argue that Reg. § 1.83–7(b)(2), which had only been proposed at that time, is invalid. The 1976 Conference Report explaining that Act states:

> The conferees intend that in applying these rules for the future, the Service will make every reasonable effort to determine a fair market value for an option (i.e., in cases where similar property would be valued for estate tax purposes) where the employee irrevocably elects (by reporting the option as income on his tax return or in some other manner to be specified in regulations) to have the option valued at the time it is granted (particularly in the case of an option granted for a new business venture). The conferees intend that the Service will promulgate regulations and rulings setting forth as specifically as possible the criteria which will be weighed in valuing an option which the employee elects to value at the time it is granted.

S.Rep. No. 1236, 94th Cong., 2d Sess. 438–39 (1976), *reprinted in* 1976–3 C.B. (vol.3) 807, 842–43. *See also* Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, 94th Cong., 2d Sess. 154 (1976), *reprinted in* 1976–3 C.B. (vol.2) 1, 166 (containing virtually identical language).

This legislative history does not demonstrate that the Reg. § 1.83–7(b)(2) interpretation of § 83 is unreasonable. First, "an analysis of legislative history is proper only to *solve*, not to *create* ambiguity." *Arizona Elec. Power,* 816 F.2d at 1375 (emphasis in original). As we explained above, the language of § 83 itself ably describes under which subsections restrictions must be disregarded—§ 83(a) and (b). This legislative history, on the other hand, provides at best an ambiguous directive regarding § 83(e)(3): It is unclear whether the conferees intended that the Commissioner should henceforth disregard the restrictions listed in then-proposed Reg. § 1.83–7(b)(2)(i–iii), or whether she should relax the rules on valuing the "option privilege" proposed in Reg. § 1.83–7(b)(3), or neither. *See* 2 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 60.5.2 at 60–51 (2nd ed.1990). Second, the 1976 Tax Reform Act in no way amended the language of § 83, which was enacted in 1969. We hesitate to rely entirely on the views of a later Congress to interpret an earlier enactment. *See United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331–32, 4 L.Ed.2d 334 (1960). Finally, this statement may well have been inserted to assuage members who could not pass the 1976 amendment contained in the Senate Finance Committee bill and discussed above. *See Pagel,* 91 T.C. at 221. It at most invited, but did not require Treasury to adopt rules that Congress did not enact. *Id.*

■ Treasury reasonably concluded that § 83(e)(3) allows restrictions to be considered when determining whether an option has a "readily ascertainable fair market value." Furthermore, Treasury reasonably concluded that certain restrictions, such as those effecting transfer, exercise, and market value, make an option's value not "readily ascertainable," because it is difficult to determine the impact of those restrictions on market value. We therefore reject appellants challenge to Reg. § 1.83–7(b)(2).

In sum, because the 1978 and 1979 options clearly did not have a "readily ascertainable fair market value" upon transfer according to Reg. § 1.83–7, § 83 did not apply until the sale of those options in 1982, *see* I.R.C. § 83(e)(3); Reg. § 1.83–7(a), and that sale therefore produced only ordinary income. We affirm the Tax Court's decision upholding the deficiency with respect to these options.

**B. The 1981 Option Held by the Trust**

Appellants did not file § 83(b) elections to include the value of the 1981 option in ordinary income in the year of grant. However, they argue that the value of that option was includable in ordinary income in the year of grant pursuant to § 83(a), because it was not subject to a substantial risk of forfeiture. They argue it was not subject to that risk because only the separate agreement among beneficiaries, not the actual terms of the options, provided that each appellant could be divested of his allocable share of the option if he left the employ of IMED. They argue that this separate agreement does not affect the tax treatment of the 1981 option.

■ We need not address this argument. Rather, we conclude that regardless of whether the separate agreement among beneficiaries affects the tax treatment of the 1981 option, § 83(a) did not apply to that option until its sale in 1982. The actual terms of that option, as opposed to the agreement among beneficiaries, provided that it could only be exercised in increments in 1983, 1984 and 1985. Therefore, it was not immediately exercisable, and condition (ii) of Reg. § 1.83–7(b)(2) was not satisfied. Accordingly, that option lacked a "readily ascertainable fair market value," § 83 did not apply until sale in 1982, *see* I.R.C. § 83(e)(3); Reg. § 1.83–7(a), and that sale produced only ordinary income. We affirm the Tax Court's decision upholding the deficiency with respect to this option.

**II. The Penalty Under I.R.C. § 6653(a) for Intentional Disregard of Rules and Regulations**

The version of I.R.C. § 6653(a) applicable to appellants provides: "If any part of any underpayment ... is due to negligence or intentional disregard of rules and regulations ... there shall be added to the tax ..." various penalties. We have established that "[i]ntentional disregard occurs when a taxpayer who knows or should know of a rule or regulation chooses to ignore its requirements." *Hansen v. Commissioner*, 820 F.2d 1464, 1469 (9th Cir.1987).

In this case, the Tax Court found that appellants learned from their various tax advisors that capital gain treatment of the 1982 options sale was contrary to Reg. § 1.83–7(b)(2). Nonetheless, appellants, together with their advisors, concluded that there was a plausible argument that the regulation was invalid. On the basis of that argument, they decided to claim capital gain treatment on their returns. Under these circumstances, the Tax Court upheld the penalties assessed pursuant to § 6653(a).

■ We review that decision for clear error. *See Hansen*, 820 F.2d at 1469. Appellants bear the burden of proving that § 6653(a) did not apply. *Id.* Appellants do not challenge the Tax Court's basic finding of fact. Rather, they argue that because they had a reasonable basis to believe that the regulation was invalid, and because they were so advised by tax professionals, they should not be subject to the penalty.

The Second Circuit has rejected such a "reasonable basis" exception to § 6653(a). *Druker v. Commissioner*, 697 F.2d 46, 53–55 (2d Cir.1982), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983). After exhaustively tracing the legislative history of the statute as well as the relevant caselaw, that court stated:

> The statutory language "there shall be added", could hardly be clearer. The reasonableness of a taxpayer's action may indeed be relevant when he is charged with negligence but not when he admittedly has flouted applicable rules and regulations which he fully understood.

*Id.* at 53. That court went on to describe favorably a Board of Tax Appeals case: "'[h]arsh though the conclusion may seem', the 5 percent addition was mandatory even where the taxpayer had reasonably believed, on the advice of counsel, that a regulation

issued by the Commissioner was invalid." *Id.* at 54 (citing *The Journal Co. v. Commissioner,* 46 B.T.A. 841, 845–46, 1942 WL 270 (1942), *rev'd on other grounds,* 134 F.2d 165 (7th Cir.1943)).

■ We too reject appellants' "reasonable basis" argument. Appellants are sophisticated businessmen, one of whom is himself an attorney. After carefully reviewing the matter with their tax advisers, they decided to ignore Reg. § 1.83–7(b)(2), because they thought it invalid. As the court in *Druker* explained, the proper course, by which they would have avoided the risk of penalty, was to file their returns in accordance with the regulation, and then to challenge the validity of the regulation in a suit for a refund. *See* 697 F.2d at 54. Instead, appellants chose to play the audit lottery. They lost. The Tax Court did not clearly err by upholding their penalty pursuant to § 6653(a).

### III. The Penalty Under I.R.C. § 6661(a) for Substantial Understatement of Tax.

The version of the Code that applies to appellants' 1982 returns provides: "If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement." I.R.C. § 6661(a) (1986). It is undisputed that the deficiencies that we have affirmed in Section I of this opinion were "substantial understatements" of tax as defined by § 6661(b). Nonetheless, the statute provides that the amount of an understatement shall be reduced by the portion of the understatement which is attributable either, 1) to tax treatment that was supported by "substantial authority," or, 2) to tax treatment about which the relevant facts were "adequately disclosed in the return or in a statement attached to the return." I.R.C. § 6661(b)(2)(B). Furthermore, the Commissioner may waive any such penalty on a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. I.R.C. § 6661(c).

■ The Tax Court concluded that appellants' tax treatment of the options was not supported by substantial authority. We re-

view this conclusion of law de novo. *See Norgaard v. Commissioner,* 939 F.2d 874, 878 (9th Cir.1991). "Substantial authority" supports a position "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions." Treas. Reg. § 1.6661–3(b)(1). Appellants' treatment of the options does not meet this test. They have relied heavily upon ambiguous legislative history from 1976 Tax Reform Act that was created subsequent to the enactment of § 83. The principle authorities supporting the contrary position include the plain meaning of the statute, and a regulation promulgated by Treasury interpreting that statute. These authorities far outweigh those cited by appellants. The Tax Court properly refused to reduce appellants' penalties pursuant to the substantial authority exception.

■ The Tax Court also found that appellants did not adequately disclose the facts relevant to their tax treatment of the options. We review this finding of fact for clear error. *See* Fed.R.Civ.P. 52(a). Appellants do not even challenge the Tax Court's finding that rather than disclosing the relevant facts, their 1982 returns actually concealed the true nature of the option proceeds. Cramer and Monaghan both claimed basis in the options, even though they knew they had none. Also, Cramer and Boynton both listed the options in sections labeled for stock, even though the returns contained separate sections for options. These unexplained misrepresentations appear designed to avoid audit. Furthermore, we reject appellants' argument that their filing of § 83(b) elections in 1978 and 1979 provided adequate disclosure. § 6661(b)(2)(B)(ii) explicitly requires that the disclosure be attached to the return itself. Therefore, the Tax Court properly refused to reduce appellants' penalties pursuant to the disclosure exception.

The Tax Court also found that appellants did not act in good faith. We review this finding of fact for clear error. *See* Fed. R.Civ.P. 52(a). The concealment described in the previous paragraph, coupled with appellants' decision to ignore Reg. § 1.83–7(b)(2), amply supports this finding. Therefore, the Tax Court correctly concluded that

the good faith/reasonable cause waiver did not apply in this case.

Accordingly, we affirm the Tax Court's decision to uphold the entire penalty for substantial understatement of tax.

## CONCLUSION

The Tax Court correctly upheld the deficiencies assessed by the Commissioner against appellants' 1982 tax payments. The Tax Court also correctly upheld penalties assessed by the Commissioner against appellants because they disregarded the relevant regulations and substantially understated their tax.

AFFIRMED.