MARTIN A. SCOTT AND ANGELA SCOTT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5000–71.   Filed February 14, 1974.

*Carl A. Stutsman, Jr.,* and *Robert P. Hess,* for the petitioners.
*Earl Goldhammer* and *Richard R. Harrington,* for the respondent.
STERRETT, *Judge:* The respondent determined a deficiency of $1,866

---

in the Federal income taxes of the petitioners for the calendar year 1967 and an addition thereto under section 6653(a)[1] of $93. The issues presented for our decision are: (1) Whether the petitioners shall be allowed any deduction as a charitable contribution for the conveyance of encumbered real property to the American Physical Fitness Research Institute, Inc.; and (2) whether the petitioners are subject to the addition to tax for the taxable year 1967 under section 6653(a).

### FINDINGS OF FACT

Martin A. Scott and Angela Scott are husband and wife who, at the time of the filing of the petition herein, maintained their legal residence in Brentwood, Calif. They filed their joint Federal income tax return for the calendar year 1967 with the district director of internal revenue at Los Angeles, Calif. Martin A. Scott will, for convenience, be referred to as the petitioner unless there is need to refer to both husband and wife, in which case, they will jointly be referred to as the petitioners.

During 1967 the petitioner was employed by a corporation known as the Firestone Group. The petitioner held the positions of vice president and secretary of the corporation and was also a 20-percent shareholder. Richard M. Firestone (hereinafter Firestone) owned the remaining 80 percent of the stock. The business of the Firestone Group was the syndication of limited partnerships which invested in real estate with high growth potential and which featured tax advantages through prepaid interest and depreciation on the investments.

The Firestone Group had syndicated from between 35 to 40 limited partnerships by the time of trial. The individual investors in these partnerships were contacted and interested in the tax shelter investment programs of the Firestone Group through media and mail advertising and through seminars held by Firestone. In a typical syndication the real property would first be located, oftentimes by a broker not affiliated with the Firestone Group, and as a matter of course the seller would be asked if he would accept the prepayment of interest. If the seller accepted prepaid interest, the purchase by the limited partnership would be made directly from the seller. Where the seller refused to accept prepaid interest, in some cases, an associate of the Firestone Group would contact charities and the transaction would be structured so that the charity purchased the realty from the seller and then resold it to the limited partnership while accepting prepaid interest. In some other cases, as was done in the instant case, an associate of the Firestone Group would purchase the realty, transfer it subject to the encumbrances to the charity in the form of a donation, and the charity would

---

[1] All Code references herein are to the Internal Revenue Code of 1954, as amended and as applicable to the taxable year involved, unless otherwise indicated.

then sell the property to the limited partnership syndicated by the Firestone Group.

The realty which was the subject of the transaction herein was a 348-acre vineyard referred to as the Rancho de Santa Fe (hereinafter Rancho) located in the counties of San Bernardino and Riverside, Calif. Although title to the land was held in the names of Lewis Guerrieri (hereinafter Guerrieri) and his wife, Guerrieri considered it to be owned by the Rancho de Santa Fe partnership which consisted of himself and his two sisters.

William A. Howard (hereinafter Howard), a real estate broker who handled Guerrieri's realty, initially contacted the Firestone Group with regard to the Rancho and set up a meeting between the petitioner and Guerrieri in April 1967. Later in 1967, after a trip to Europe by Guerrieri, extensive negotiations concerning the sale of the Rancho took place.

During the initial stages of the negotiations, after it was ascertained that Guerrieri would not accept prepaid interest, the petitioner informed Guerrieri's attorney that the purchaser of the Rancho would be a charity and that the exact identity of the purchaser would be given later. Guerrieri's attorney was later informed that the petitioner would purchase the property from Guerrieri and donate it to a charity, and the attorney understood that, since the sale by Guerrieri was conditioned on the property's being resold, the ultimate purchaser would be a limited partnership.

The petitioner and Guerrieri, through his attorney, negotiated two contracts, executed on September 13, 1967, captioned "Agreement for Purchase and Sale of Real Property" and "Agricultural Agreement." The latter of these contracts provided that Guerrieri would manage the vineyard. The Agreement for Purchase and Sale of Real Property provided that the purchase price of the Rancho would be $1,053,000 plus certain additional amounts set forth in a promissory note. It further provided that the purchase price would be broken down as follows: a downpayment of $175,000 to be deposited in escrow prior to closing; the sum of $678,000 and certain additional amounts evidenced by a first trust deed promissory note and secured by a first deed of trust; and the sum of $200,000 evidenced by a second trust deed promissory note and secured by a second deed of trust. Both of these notes, as actually written, bore interest at the rate of 6.25 percent per annum. According to the Agreement of Purchase and Sale of Real Property, title to the Rancho would be conveyed to the purchaser Martin A. Scott at the close of the escrow. However, as the purchase actually evolved, the petitioner gave Guerrieri another note in the amount of $175,000 secured by a deed of trust instead of cash in order to obtain title to the property. All three notes were purchase-money notes.

The Agreement for Sale and Purchase of Real Property also provided that the seller would provide the purchaser with title insurance in the amount of $1,253,000 and that the purchaser would pay any real estate commissions resulting from the transactions set forth therein. The purchaser Martin A. Scott was also given the right to cancel the sale if he was unable to find a buyer for the property prior to December 31, 1967. In such case the petitioner would be liable for all escrow costs and all of Guerrieri's attorneys' fees.

The additional amounts of principal referred to above in the Agreement for Purchase and Sale of Real Property were set forth in a document entitled "First Trust Deed Note" dated November 27, 1967. By the terms of this note, payments on its principal were not required to begin until 10½ years from the date of the note. This document provided that the $678,000 principal amount of the note would be increased by certain amounts of up to $200,000 called "additional principal" each year for 9 years commencing 2 years from the date of the note. If the note was paid in full prior to 6 years from its date, there must be paid, besides the original principal and interest to date of payment, the cumulative additional principal then due and a further additional amount of principal. If the note was paid in full on or after 6 years from the date thereof but prior to maturity, the cumulative additional principal then due was required to be paid in addition to the original principal of $678,000 and interest thereon. The matrix of possible principal payments required and of encumbrances evidenced by these notes at the time of purchase and at the time of conveyance to the charity is as follows:

| $175,000 note and $200,000 "Second Trust Deed Note" | Original principal of "First Trust Deed Note" | Cumulative "Additional Principal" in "First Trust Deed Note" | Further additional amounts of principal under "First Trust Deed Note" | Date (from November 27, 1967) of full payment of "First Trust Deed Note" | Total principal |
|---|---|---|---|---|---|
| $375,000 | $678,000 | 0 | $111,605 | prior to 2 years | $1,164,605 |
| 375,000 | 678,000 | $19,700 | 91,905 | prior to 3 years | 1,164,605 |
| 375,000 | 678,000 | 40,631 | 70,974 | prior to 4 years | 1,164,605 |
| 375,000 | 678,000 | 62,870 | 48,735 | prior to 5 years | 1,164,605 |
| 375,000 | 678,000 | 86,499 | 25,106 | prior to 6 years | 1,164,605 |
| 375,000 | 678,000 | 111,605 | 0 | prior to 7 years | 1,164,605 |
| 375,000 | 678,000 | 138,280 | 0 | prior to 8 years | 1,191,280 |
| 375,000 | 678,000 | 166,623 | 0 | prior to 9 years | 1,219,623 |
| 375,000 | 678,000 | 196,737 | 0 | prior to 10 years | 1,249,737 |
| 375,000 | 678,000 | 200,000 | 0 | after 10 years | 1,253,000 |

Thus the escalating amount of principal encumbrances on the Rancho ranged from a minimum of $1,164,605 to $1,253,000 depending on when the first trust deed note was paid in full. Guerrieri's attorney requested that the petitioner state the purchase price in the notes and the Agreement for Sale and Purchase of Real Property more simply; however the petitioner refused to do so stating that the Firestone Group always structured the transactions in that manner.

At the meeting called for the signing of the Agreement for Sale and Purchase of Real Property Howard and the petitioner disagreed as to what amount Howard's commission should be. As a result of this disagreement the petitioner telephoned Firestone to discuss the matter of Howard's commission. Firestone was unwilling to accept the amount of commission requested by Howard and would have called the deal off if the terms were not changed. An agreement was then worked out in which Howard was to receive a $26,325 commission to be paid or caused to be paid by the petitioner. Howard agreed to receive $13,000 at the close of the escrow and the balance, for which the petitioner had no personal liability, in installments of $5,625, $5,625, and $2,075 to be paid, respectively, 2, 3, and 4 years from the close of the escrow. The petitioner signed this commission agreement twice, once individually and once on behalf of the Firestone Group.

On October 2, 1967, Firestone, Robert A. Miller, and the petitioner made application to the commissioner of corporations of the State of California for a permit authorizing the sale of interests in a limited partnership to be known as the Rancho Sante Fe Co. (hereinafter company). Pursuant to requirements of the California securities law, an appraisal of the fair market value of the aforesaid real property was obtained from a State-approved appraiser as a condition to the sale of syndicated interests in a limited partnership formed to develop said 348 acres and its value was determined to be $3,717 per acre, an aggregate value of $1,295,000. A permit was issued on December 1, 1967, to these three men as general partners of the company authorizing them to sell and issue securities representing limited partnership shares in the company.

The petitioner received a grant deed to the Rancho, dated November 8, 1967, from Guerrieri and his wife. However, this deed was not recorded until December 15, 1967. On this deed it was requested that all tax statements be mailed to the Rancho Santa Fe Company [sic], care of the Firestone Group.

At the same time as the negotiations with Guerrieri and his lawyer took place, Firestone and the petitioner discussed the possibility of the donation of the Rancho to the American Physical Fitness Research Institute, Inc. (hereinafter institute), with members of that organization. The institute was, and is, an organization exempt from Federal income taxes under section 501(c)(3) because it was organized and operated exclusively for charitable and educational purposes. The institute indicated that it would accept donations of property providing the following conditions were met: (1) The charity would not accept any property which required it to engage in business; (2) the charity would not accept any property for which it was to have any financial liability and would make no payments at its own expense; (3) the charity would not seek a buyer for the property; and (4) if a

buyer was not found, the charity would let the property be foreclosed. When discussing the donation of the Rancho to the institute, the petitioner and the members of the institute came to an understanding, without any legal commitment however, that the property would be sold and that the petitioner would locate a purchaser for the property.

On November 17, 1967, the petitioner and his wife transferred the Rancho, subject to the encumbrances thereon, to the institute by grant deed. The amount of the encumbrances on the Rancho at that point, although not put in writing until November 27, 1967, ranged from $1,164,605 to $1,253,000, depending on when the aforementioned first trust deed note was paid in full. Again the tax statements relating to the Rancho were requested to be sent to the company, care of the Firestone Group. This deed was recorded on December 15, 1967, immediately after the recording of the deed from Guerrieri and his wife to petitioner.

After receiving the deed the institute sold the Rancho to the company for $1,229,000, which sale was also recorded on December 15, 1967. The company executed its note, secured by a deed of trust, in the amount of $1,229,000. The principal amount of this note included all encumbrances to which it was subordinate, here the notes of the petitioner, the principal amounts of which could vary between $1,164,605 and $1,253,000. Consequently, the note given by the company could require payments as high as $1,253,000. The interest rate on this note was 6.525 percent per annum until and including December 15, 1971, and thereafter was 6.18 percent per annum. The note also stated that the company had made an initial payment of $279,000, which it called interest paid in advance.

The $279,000 payment by the company was placed in an escrow account, which sum was disbursed as follows: $175,000 went to Guerrieri as the downpayment on the Rancho required by the Agreement for Sale and Purchase of Real Property; $91,000 was paid as a commission to the Firestone Group; and $13,000 was paid as a commission, which the petitioner had agreed to pay or cause to be paid to Howard. The institute received none of this $279,000 initial payment made by the company. The only economic benefit that the institute received in the transaction was a check in the amount of $5,625 in December 1971. At no time did the petitioner ever expend any of his personal funds to acquire the Rancho and all moneys paid to acquire the Rancho or paid to and retained by the institute were paid by the company.

Several years after the transfer of the Rancho to the institute and its concurrent sale to the company, the institute reconveyed its deed of trust on the property to the company because the institute had not received the payment which it was to pass on to Guerrieri and it refused to make any payment out of its own funds. The institute had no further interest in the Rancho from that point.

On the partnership return of income for the Rancho de Santa Fe partnership for the taxable year ending June 30, 1968, Guerrieri reported the sales price of the Rancho as $1,253,000.

On their joint Federal income tax return for the taxable year 1967, in the computation of their charitable contribution deduction, the petitioners reported the fair market value of the Rancho at the time of their conveyance as $1,229,000, this amount being based on the purchase price in the subsequent sale to the company, and the amount of encumbrances on the property at that time as $1,053,000. The net value of the claimed charitable contribution was then reported as $176,000, the difference between the fair market value of the property and the claimed amount of encumbrances thereon at the time of the transfer to the institute. The charitable contribution as actually claimed and used on the 1967 return was $7,667, which amount was 30 percent of adjusted gross income. Also noted on the return was a carryforward in the amount of $168,333.

The respondent disallowed this deduction in full in his notice of deficiency upon his determination that the petitioners were not entitled to such a deduction. At trial, the petitioners admitted that the net value of the property transferred was not $176,000 as claimed on their return, but rather was $64,395, this being the difference between the $1,229,000 fair market value of the property and the encumbrances then asserted by petitioners to be in the amount of $1,164,605. This concession, however, does not affect the petitioners' tax liability for the taxable year involved since this amount exceeded the amount of $7,667 claimed as a deduction on the petitioners' 1967 return.

OPINION

The first issue presented in this case is whether the petitioners are entitled to any charitable contribution deduction under the provisions of section 170 on account of their conveyance to the American Physical Fitness Research Institute, Inc., concededly a qualifying organization under section 170(c), on November 17, 1967, of 348 acres of land referred to as the Rancho de Santa Fe.

In September of 1967, the petitioner Martin A. Scott in his individual capacity agreed to purchase the Rancho from its owner. This agreement allowed the petitioner to cancel the sale if he was unable to locate a purchaser for the property by the end of the year. The petitioner was employed by a real estate firm which had previously been contacted by the agent of the Rancho's owner about the possible sale of this property to one of the limited partnerships to be syndicated by the real estate firm. The petitioner was a 20-percent shareholder in this real estate firm. The sale to such a partnership was not made because the Rancho's owner was unwilling to accept prepaid interest. On No-

vember 8, 1967, the petitioner received a grant deed to the Rancho and later in the month executed several purchase-money notes and deeds of trust which called for principal payments ranging from $1,164,605 if one of the notes was paid in full prior to 7 years from the date of the note and increasing yearly to $1,253,000 if not paid prior to 10 years from the date of the note. On November 17, 1967, the petitioners transferred the Rancho, subject to the encumbrances thereon, to the institute which, as part of an understanding between the petitioner, the real estate firm, and itself, sold the Rancho to a limited partnership syndicated by the real estate firm for $1,229,000. The institute received $279,000 labeled "prepaid interest," $175,000 of which went to pay the downpayment to the original owner, $91,000 of which went to the real estate firm as a commission, and the remaining $13,000 of which went to the original owner's agent as a commission.

The petitioners contend that under the provisions of section 170 they are entitled to a deduction for their contribution of land in the amount of the net value of the gift. The fair market value of the Rancho on the date of the conveyance was $1,229,000. From this amount the petitioners deduct $1,164,605 as the encumbrance to which the property was subject in order to derive the net value of the gift at $64,395.

On the other hand the respondent argues that the petitioners are not entitled to any deduction on the grounds that (1) the transfers to the petitioner and to the charity were shams and that actually the limited partnership purchased the property from the original owner, (2) assuming there was substance to the transfer to the charity, the transfer was made in expectation of direct economic benefits which otherwise might not be forthcoming, and (3) assuming there was a charitable contribution within the intendment of section 170, such contribution had no value within the meaning of the tax law because at the time of the transfer the property was encumbered in an amount greater than the $1,229,000 fair market value. We agree with the respondent's third argument and do not herein find it necessary to reach the first two.

No doubt petitioner would candidly concede that the above-described plan was devised as a so-called "tax shelter" with tax savings a sine qua non. Be this as it may it does not automatically follow that the plan was a failure tax-wise. *Gregory v. Helvering*, 293 U.S. 465 (1935). We must look to the economic realities of the situation. *Ragland Investment Co.*, 52 T.C. 867 (1969), affd. 435 F. 2d 118 (C.A. 6, 1970).

With respect to contributions of property, section 1.170-1(c)(1) of the Income Tax Regs. provides in part:

(c) * * * (1) *General rules.* If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * *

Since there is no dispute that the fair market value of the Rancho on the date of the transfer was $1,229,000, we must determine what part the encumbrances on the Rancho play in determining the amount of any allowable deduction.

In *Maysteel Products, Inc.*, 33 T.C. 1021 (1960), reversed on another issue 287 F. 2d 429 (C.A. 7, 1961), this Court allowed the petitioner therein a deduction in the amount of the petitioner's equity in the fair market value of bonds donated to a charity. At the time of the donation in that case, the bonds had a fair market value of $119,-000 and were held by a bank as collateral security for a loan in the amount of $100,000 used to purchase the bonds. We held that the petitioner there was entitled to a $19,000 charitable contribution deduction. When a gift to a charity of property subject to an encumbrance is made, the amount of the deduction is the donor's equity in the fair market value of the property, or the difference between the fair market value of the property and the amount of the encumbrance thereon. *Maysteel Products, Inc.*, *supra*. Cf. *D. S. Jackman*, 44 B.T.A. 704 (1941); *Commissioner* v. *Procter*, 142 F. 2d 824 (C.A. 4, 1944), reversing a Memorandum Opinion of this Court, certiorari denied 323 U.S. 756 (1944).

Thus, the problem here is to determine the amount of the encumbrances on the Rancho. In this regard the respondent contends that the amount of the encumbrances total $1,253,000, which sum would include in full the discount for early payment as provided for in the first trust deed note. The petitioners, on the other hand, argue that the encumbrances total only $1,164,605 on the date of the conveyance.

Since neither the parties nor our independent research has turned up any cases on point involving charitable contributions, we look to other areas to aid us in determining the amount of the encumbrance herein. In *Manuel D. Mayerson*, 47 T.C. 340 (1966), the petitioners purchased a building on December 31, 1959, in exchange for a long-term purchase-money mortgage under which they had no personal liability. The note was in the face amount of $332,500 but if paid off within the first year, or the 2 succeeding years, it could be satisfied for $275,000 or $298,750, respectively. This Court determined that for the years 1960 and 1961 the basis for depreciation of that property was $332,500, or the nondiscount price of the note, on the theory that the amount of an unassumed mortgage on purchased property should be included in the basis used for depreciation. Cf. *Crane* v. *Commissioner*, 331 U.S. 1 (1947); *Blackstone Theatre Co.*, 12 T.C. 801 (1949). The "bonus discount" provision there did not make the amount of the obligation contingent or indefinite.

In the instant case, on the basis of *Manuel D. Mayerson*, *supra*, we conclude that the amount of the encumbrance to which the Rancho was subject is $1,253,000 because the "bonus discount" should be in-

cluded in the amount of the encumbrance. Since the encumbrances exceed the fair market value of $1,229,000 of the property, the petitioners are not entitled to a charitable contribution deduction for their conveyance of the property.

Even without the support of *Manuel D. Mayerson, supra,* we would be constrained to hold for the respondent. Assuming the petitioners' transfer of the Rancho was a charitable contribution within the intendment of section 170, it is incumbent upon the petitioners to prove the value of the contribution. Rule 142, Tax Court Rules of Practice and Procedure. Granted the charity has been given a right to a potential benefit, it is the petitioners' burden to show that there is more than a remote possibility that the charity will benefit. The petitioners have introduced no evidence to show that the discount provision would ever be taken advantage of. The first trust deed note itself did not call for any payment prior to 10½ years from the date of the note and in fact full payment for the property was never made. The petitioners themselves had no effective control as to when the note would be paid. Because the possible amounts of the encumbrances bracketed the fair market value of the property, the benefit to the charity is uncertain.

The second issue involves an addition to tax under section 6653(a) for the understatement of tax due resulting from the claimed charitable contribution deduction. Section 6653(a) provides that "If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * *, there shall be added to the tax an amount equal to 5 percent of the underpayment." The determination of the respondent in this regard is prima facie correct and the petitioners have the burden of proving that no part of any underpayment was due to negligence or intentional disregard of the respondent's rules and regulations. *Leroy Jewelry Co.,* 36 T.C. 443 (1961).

The record shows that the petitioners honestly believed that they made a contribution to the institute. While we express no opinion as to the merits, we find that with regard to the respondent's first two arguments, *supra,* for denial of the deduction there was clearly a bona fide dispute which presents substantial issues of law and fact and which consequently prevents any imposition of an addition to tax under section 6653(a). *J. Bryant Kasey,* 54 T.C. 1642 (1970), affirmed per curiam 457 F. 2d 369 (C.A. 9, 1972). We note also that taxpayers are, and should be, allowed to attempt to minimize their taxes without fear of recrimination by the respondent in every instance. While petitioners may have been negligent in claiming a charitable contribution deduction in the amount of $176,000, rather than $64,395, on their Federal income tax return, only $7,667 of the claimed contribution was actually deducted and caused an underpayment. We think that deductibility of the potential benefit of $64,395 to the charity from the "bonus dis-

count" also presented a substantial issue of law and fact. While the petitioners might have reasoned in preparing their 1967 return that the amount of the encumbrance included the "bonus discount" as decided in 1966 in *Manuel D. Mayerson, supra,* we do not find such lack of reasoning to be negligent or in intentional disregard of the respondent's rules and regulations. Because the $7,667 deduction which caused the underpayment in the instant case is less than the amount of the contribution we deem not to be negligently claimed, we conclude that no addition to tax should be imposed under section 6653(a).

*Decision will be entered under Rule 155.*