ALBERT C. and MARIE L. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 14308-79.
United States Tax Court
T.C. Memo 1981-219; 1981 Tax Ct. Memo LEXIS 521; 41 T.C.M. (CCH) 1427; T.C.M. (RIA) 81219; May 4, 1981. Albert C. Smith, pro se. Robert F. Geraghty, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioners' Federal income tax for the calendar years 1975 and 1976 in the respective amounts of $ 4,105.07 and $ 13,425.55. Concessions having been made, the sole issue for decision is the fair market value of certain patents contributed by petitioners to the University of Santa Clara in 1974, 1975, and 1976. *522 [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife who resided in Los Altos, California, at the time the petition herein was filed. They timely filed their joint Federal income tax returns for 1975 and 1976 with the Internal Revenue Service Center in Fresno, California. Marie L. Smith is a party to this proceeding solely by having filed joint income tax returns with her husband; consequently, Albert C. Smith will hereinafter be referred to as petitioner. Petitioner is an attorney specializing in patent law who was at all relevant times employed by Hewlett-Packard Company. He filed patent applications in the United States, United Kingdom, and Canada, for an invention entitled "Liquid Propulsion Apparatus and Method of Fabrication." The patents describe a liquid propulsion system which is in essence an engine with an unusual hollow shaft arrangement *523 serving as a pump and as an integral rotating member of the engine itself. The shaft has internal veins that cause any liquid within it to be accelerated and discharged from the inlet to the outlet, and therefore either propel an object or discharge the liquid at a given velocity. The primary practical application of the petitioner's invention is the propulsion of recreational racing and ski boats. It also has applications in industrial and agricultural pumping. Patents were thereafter issued and may be summarized as follows: Application
Application
Issue
Country
Serial No.
Date
Date
Patent No.
United States
184,462
9/28/71
1/15/74
3,785,327
United States
184,462
7/12/73
3/11/75
3,869,775
United Kingdom
37005/72
8/8/72
11/6/74
1,359,438
Canada
149,097
8/10/72
1/7/75
960,520
The petitioner contributed all of his interest in the invention and the respective patents [2] to the University of Santa Clara by various gift deeds. He claimed contribution deductions on his 1974, 1975, and 1976 Federal income tax returns for the asserted fair market values of these patents on their respective contribution dates. The following schedule *524 details these transactions: Date
Contribution
Patent
Contributed
Deduction
United Kingdom
12/13/74
$ 8,618.40
(1,359,438)
Canada
9/3/75
35,997.50
(960,520)
United States
6/18/76
164,026.40
(3,785,327 and
3,869,775)
The parties have stipulated that the petitioner's invention and the patent rights relating thereto constitute "30% capital gain property" as defined by section 1.170A-8(d)(3), Income Tax Regs. They also agree that the University of Santa Clara, located in Santa Clara, California, is a qualified charitable organization for purposes of deduction provided by section 170. [3]
Respondent has disallowed the petitioners' deductions with respect to the donated patents on the basis that they had no fair market value on the dates given. OPINION *525 Section 170(a)(1) establishes the general rule for the allowance of a deduction for charitable contributions. Respondent does not dispute that the petitioners are entitled to a contribution deduction for the gifts of patents to the University of Santa Clara, to the extent of their fair market value. Respondent maintains, however, that said patents had no fair market value at the time of the respective gifts. Section 1.170A-1(c)(1), Income Tax Regs., provides that if a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. Section 1.170A-1(c)(2) defines fair market value as that price at which property could change hands between a willing buyer and a willing seller, free of duress and with reasonable knowledge of all material facts. The sole question presented herein is the amount of the fair market value of the contributed patents. The burden of proof rests with the petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure; Scott v. Commissioner, 61 T.C. 654, 663 (1974). *526 As is so common in cases of this sort, the litigants rely on the testimony and reports of their respective experts. We find it unnecessary to reiterate at length the testimony of petitioners' two experts and the respondent's expert. After a careful review of all of their testimony and reports we are of the opinion that the conclusions of respondent's expert, L. Lawton Rogers, III, [4] are most firmly supported by the evidence. Mr. Rogers, utilizing the date of petitioner's appraisers, interviews with personnel at Berkeley Pump Company (the largest U.S. producer of marine pump engines), his evaluation of the validity of the patents, and his own extensive experience in the licensing of patents, valued the U.S. patents at no more than $ 3,500. His approach largely paralleled that of petitioners' expert, multiplying (a) the potential market (50,000 units) *527 by (b) antitipated market penetration (3 percent), by (c) unit cost ($ 1,000), by (d) a reasonable royalty rate (1 percent), and then discounting the result for the present value of money (.6). In addition, he considered patent validity (75 percent) and technological feasibility (50 percent). Multiplying all of these figures together Mr. Rogers determined the fair market value of the U.S. patents at $ 3,375--which he rounded to $ 3,500. Then, using the relative values assigned by petitioners' appraiser to the foreign patents (Canadian patent 21 percent and United Kingdom patent 5 percent), he determined their fair market values to be $ 800 and $ 200, respectively. He noted: It has been my experience that inventions at this early stage are rarely sold for cash. The usual procedure is for the patent owner to joint venture a development effort with another who provides the development capital. In such instances, the return of the patent owner is a function of the success of the joint venture, i.e., future sales. The other common practice is to license the patent for a royalty to be paid out of sales proceeds. In both of these instances, the parties recognize the highly speculative *528 nature of the venture, and the patent owner is compensated only out of future sales. The petitioners maintain that this Court should not consider the additional factors considered by Mr. Rogers, particularly patent validity. We disagree. Petitioners correctly state that we generally will not review the validity of patents. However, a potential purchaser of a patent will consider its validity, difficulty of enforcement, and potential litigation as relevant to the amount it is willing to pay. Any factor which effects what a willing purchaser will pay is relevant for determining fair market value. This in no way permits the respondent to collaterally attack the patents' validity in this Court. Petitioners also assert that respondent has presented no evidence to counter their appraiser's report, attached to their income tax returns for 1975 and 1976, with respect to the value of the foreign patents. We disagree. Mr. Rogers, using data found in petitioners' appraisals in part, and applying his own reasoning, arrived at the values of the foreign patents. Here, again, we place great weight *529 on and concur with Mr. Roger's findings. Thus, having considered all of the evidence presented, we agree with respondent's expert that the value of the U.S. patents had a combined value of $ 3,500 on the date contributed to the University of Santa Clara and that the Canadian and United Kingdom patents had respective values of $ 800 and $ 200 on their respective contribution dates. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. The taxable year 1974 is not at issue herein. The value of the patent contributed by petitioners that year is at issue only in that it generated an excess charitable contribution deduction carried forward and used by petitioners to compute their 1975 deduction.↩
2. All of the patents refer to the same invention. The two United States patents merely refer to different aspects of the same invention.↩
3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
4. Mr. Rogers is a patent attorney engaged in private practice in Arlington, Va. In addition to private practice he has been employed as an electrical engineer for Bethlehem Steel Corp., a patent research engineer for the Aircraft Manufacturers' Association, and the manager of Washington Patent Operations for Bendix Corp.↩