BILLY LEE SWICEGOOD AND CAROLYN LOWDER SWICEGOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swicegood v. Commissioner
Docket No. 15953-87
United States Tax Court
T.C. Memo 1989-467; 1989 Tax Ct. Memo LEXIS 467; 57 T.C.M. (CCH) 1456; T.C.M. (RIA) 89467; August 29, 1989; As corrected September 6, 1989 William E. West, Jr., for the petitioners. Frank D. Armstrong, Jr., for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioners' 1983 Federal income tax in the amount of $ 16,914 and additions to tax for 1983 in the amounts of $ 4,228.50 under section 6661, [1] $ 845.70 under section 6653(a)(1), and 50 percent of the interest due on $ 16,914 under section 6653(a)(2). The issues for decision are (1) whether petitioners are entitled to the foreign earned income exclusion under section 911, *470 (2) whether petitioners are entitled to deductions for expenses relating to employment as an airline pilot, (3) whether petitioners are entitled to deductions claimed for expenses relating to a personally owned airplane, and (4) whether petitioners are liable for additions to tax under sections 6653(a)(1) and (2) and 6661. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. During all relevant periods, petitioner Billy Lee Swicegood ("petitioner") and petitioner Carolyn Lowder Swicegood ("Mrs. Swicegood") were husband and wife. Petitioners always have been citizens of the United States. Petitioner is a pilot crew member for Trans World Airlines ("TWA"). He began working for TWA in November 1965. During the year in issue, petitioner was employed by TWA's International Division, which was headquartered at John F. Kennedy Airport ("JFK") near New *471 York City. In 1983 TWA's corporate headquarters was located in Kansas City, Missouri, and petitioner's payroll checks from TWA were drawn on a Kansas City bank. From 1971 through 1976, petitioners and their daughter Angie (born February 10, 1970) lived year-round in a condominium petitioners owned at 107 Mayfair Court, Freeport, Grand Bahamas (the "Freeport condo"). In 1977 petitioners purchased a house in Hollywood, Florida, and Mrs. Swicegood and Angie moved from the Bahamas into that house. Mrs. Swicegood and Angie moved to the United States just as Angie was reaching school age, and they left the Bahamas because of the poor quality of the Bahamian public schools and the prevalent drug problem there. In 1980 or 1981, petitioners sold that house in Hollywood and purchased another house in Hollywood in which Mrs. Swicegood, Angie, and petitioners' second daughter Christie (born September 3, 1978) still resided in 1983. Since his wife and daughters have lived in Florida, petitioner has continued to spend time in the Bahamas, living in the Freeport condo while there. The distance from Freeport to the airport closest to Hollywood, Florida, is 84 nautical miles. In 1983 petitioners *472 maintained a brokerage account and a checking account with institutions in Hollywood, Florida. Petitioner's TWA payroll check was deposited into the checking account in Hollywood, and both petitioners wrote checks on that account. Petitioners also had savings accounts in the bank in Hollywood, in the TWA Credit Union, and in North Carolina. Petitioner maintained no bank or brokerage accounts in the Bahamas during 1983. In 1983 petitioners received mail at three addresses: a post office box in Dania, Florida; a post office box in Freeport; and their house address in Hollywood, Florida. Mail service in the Bahamas is not particularly reliable, [2] however, so petitioner's bills and most of his other business mail are sent to the post office box in Dania, Florida. In fact, on the petition filed herein and on their United States passports, both petitioners list their address as that Dania post office box. In 1983 petitioner owned five cars -- three located and licensed in the United States, and two located in the Bahamas, one of which was licensed. *473 In 1983 both petitioners had Bahamian driver's licenses, and Mrs. Swicegood had a Florida driver's license. The Bahamas does not have an income tax; it instead imposes customs duties as a major source of governmental revenues. In 1983 petitioner paid all lawful taxes required of a Bahamian resident, amounting to several thousand dollars of duty tax. In 1983 petitioner's base for his TWA flights was at JFK, but all of his flights did not originate and terminate there. When a flight did not begin or terminate at JFK, petitioner on his own could fly directly between his home and the beginning or terminating airport, or he could rely on TWA to provide transportation between JFK and the other airport, in which case petitioner would be responsible for going between JFK and his home. Flying directly between his home and the airport where he worked was not costly to petitioner, however, because he, as a commercial airline pilot, was entitled to fly without charge to any location served by United States commercial airlines, subject to the availability of space on the plane. Petitioner's employment for TWA in 1983 consisted of 20 series of flights. Each flight series began and terminated *474 in the United States and had one or more stops at the cities of Paris, London, Tel Aviv, or Geneva. The beginning and termination points of the 20 flight series are shown below: City
Begin
Terminate
Boston
10
6
New York (JFK)
7
13
St. Louis
2
0
Chicago
1
1
In 1983 petitioner did not make any flights for TWA in January or December; he only worked that year in February through November. Counting the days the flight series began and terminated, each of the 20 flight series took between three and six days. The 20 flight series took a total of 80 days, or 26 percent of the total number of days during February through November of 1983. Petitioner received from TWA a Form W-2 for 1983 which showed he received total compensation of $ 78,768.18. Petitioners reported that amount as wages on their 1983 U.S. Individual Income Tax Return. Petitioners also filed a Form 2555 (Foreign Earned Income) with their 1983 income tax return and claimed an exclusion from taxable income for $ 45,948 of foreign earned income. The $ 45,948 exclusion amount was computed by multiplying petitioner's total TWA wages by 7/12. On page 1 of the Form 2555, petitioner's *475 "tax home" is given as "Freeport, Grand Bahama Islands." On their 1983 tax return, petitioners also claimed a deduction in the amount of $ 1,293 for employee business expenses relating to petitioner's TWA employment. Deductions were claimed for the following expenses: Bus Fare
$    64
Parking
114
Lodging
1,033
Paging Service
82
$ 1,293
On their 1983 tax return, petitioners claimed deductions on a Schedule C (Profit or (Loss) From Business or Profession) in connection with the maintenance and operation of a Piper PA-32 aircraft petitioner owned. The Schedule C reflected no income but claimed deductions for the following expenses: Depreciation
$ 3,834
Fuel
943
Parking
382
Maintenance
2,454
$ 7,613
In the notice of deficiency, respondent determined that petitioner was not entitled to any foreign earned income exclusion and disallowed all deductions claimed for employee business expenses and for the Piper aircraft. OPINION 1. SECTION 911 EXCLUSION We first must decide whether petitioner is entitled to an exclusion for foreign earned income under section 911. *476 As in effect in 1983, section 911(a) allowed a qualified individual to exclude from gross income up to $ 80,000 of foreign earned income. A qualified individual is one who: (1) is a bona fide resident of a foreign country for an uninterrupted period which includes an entire taxable year or is physically present in a foreign country during 330 days of any twelve-month period (sec. 911(d)(1)); (2) has a "tax home" in a foreign country (sec. 911(d)(1) and (3)); and (3) does not have his abode within the United States (sec. 911(d)(3)). Whether a United States citizen is a bona fide resident of a foreign country requires an examination of all relevant facts and circumstances, and factors to be considered by the Court include: (1) intention of the taxpayer; (2) establishment of his home in the foreign country for an indefinite period; (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people, and assimilation into the foreign environment in general; (4) physical presence in the foreign country consistent with his *477 employment; (5) nature, extent, and reasons for temporary absences from his foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status as a resident as contrasted to status as a transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of his employment -- whether his assignment abroad could be promptly accomplished within a definite or specified time; and (11) good faith in making his trip abroad, e.g., whether for purpose of tax evasion. Schoneberger v. Commissioner, 74 T.C. 1016, 1022-1023 (1980); Dawson v. Commissioner, 59 T.C. 264, 268 n.4 (1972) (citing Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. 1962), revg. 36 T.C. 131 (1961)). For purposes of section 911, the tax home of an individual is the same as his "home" for purposes of section 162(a)(2). Sec. 911(d)(3). The term "home" for purposes of section 162(a)(2), however, is not defined uniformly by the Courts *478 of Appeals. A taxpayer having his abode within the United States cannot have a tax home in a foreign country for purposes of section 911. Sec. 911(d)(3). During the year in issue, petitioner had several and substantial contacts with the Bahamas, and we shall assume arguendo that he meets the requirement in section 911(d)(1) of being a bona fide resident of a foreign country during that year. Petitioner also is required, by section 911(d)(1) and (3), to have had a tax home in a foreign country, and respondent contests petitioner's assertion of a tax home in a foreign country. As noted above, there are varied interpretations of "home" among the Courts of Appeals and this Court. We therefore must decide where appeal of the instant case lies and then examine the interpretations of "home" by that appellate court and by this Court to ascertain the appropriate standard to apply to petitioner. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Petitioners' Legal Residence
Section 7482(b) provides that venue for appeal *479 from a decision of this Court lies, unless stipulated to the contrary, in the Court of Appeals for the circuit in which the taxpayer's legal residence is located when the petition is filed. In this context, "residence" means domicile. Berkery v. Commissioner, 90 T.C. 259, 262 (1988) (Court reviewed), supp. op. 91 T.C. 179 (1988), affd. 872 F.2d 411 (3d Cir. 1989). On June 4, 1987, petitioners filed their petition, as well as a designation of Winston-Salem, North Carolina, as the site of trial for the instant case. Petitioners designated North Carolina as the place of trial because petitioner during 1987 was spending his time away from his TWA duties doing "some work" on a house he owned in Watauga County, North Carolina. During 1987, however, petitioners still owned the Freeport condo, and Mrs. Swicegood and petitioners' daughters lived in Florida, at least during the school year. Thus, when petitioners filed their petition, they arguably might have resided in any of three places -- the Bahamas, North Carolina, or Florida -- so that appeal of the instant case could lie in the Court of Appeals for the District of Columbia, the Fourth *480 Circuit, or the Eleventh Circuit, respectively. Sec. 7482(b)(1); 28 U.S.C. sec. 41 (1982). The parties have somewhat eased our task of deciding legal residence. Respondent requests that we find as a fact that "petitioners' legal residence is located, for venue purposes, either in Hollywood or Dania, Florida, or in North Carolina." Petitioners, in their reply brief, "agree with [that] proposed finding of fact." Accordingly, we deem the parties to have stipulated that appeal in this case would not lie to the D.C. Circuit. Sec. 7482(b)(2). We thus must choose between North Carolina and Florida as petitioners' legal residence for appeal purposes. The only evidence in the record regarding petitioners' residence on June 4, 1987, is petitioner's testimony. At the trial held March 15, 1988, respondent's counsel asked questions of petitioner such as "Is [Watauga County, North Carolina] where you currently reside?" and "How long have you been residing in Watauga County?" In response to each such question using the word "reside" or a form thereof, petitioner answered in a fashion whereby he deliberately did not use the word "reside" to describe his ties to *481 North Carolina. Rather, petitioner responded with statements such as "I am staying now [in North Carolina]" or "I am using [the house in North Carolina] now for my own personal use." Petitioner also indicated, by his testimony, that he was planning to leave North Carolina once he completed work on the house. It thus appears that petitioner intended his stay in North Carolina to be, at most, temporary, and not any permanent residence. "Domicile is based on physical residence conjoined with the intent to remain thereat, at least for a time. Texas v. Florida, 306 U.S. 398, 424 (1939)." Berkery v. Commissioner, 90 T.C. at 262 (quoting Brewin v. Commissioner, 72 T.C. 1055, 1059 (1979), revd. and remanded on other issues 639 F.2d 805 (D.C. Cir. 1981)). Moreover, petitioner testified that he first went to Watauga County, North Carolina, to work on the house in July 1987. Inasmuch as (1) there is no evidence to contradict that testimony and (2) the petition was filed in June 1987, one month before petitioner says he went *482 to his North Carolina house, we find that neither petitioner resided in North Carolina when the petition was filed. We therefore find that, for the purpose of venue for appeal, petitioners' legal residence at the time they filed their petition in the instant case was in Florida. Consequently, venue for appeal would lie in the Eleventh Circuit, and we look to that Court's precedent to decide if it is inconsistent with ours so as to evoke the rule in Golsen. Tax Home
Having decided petitioners' legal residence at the time the petition was filed in 1987, we now focus our inquiry on petitioner's tax home during the year in issue, 1983. As noted above, section 911(d)(3) defines the term "tax home" as an individual's "home" for purposes of section 162(a)(2). We would look to the Eleventh Circuit's interpretation of "home," but that court has not yet discussed the definition of home for purposes of either section 162(a)(2) or section 911. We thus turn to the Fifth Circuit's interpretation of home, because that court's precedent as of October 1, 1981, remains binding on the Eleventh Circuit until specifically overruled in an en banc decision. Bonner v. City of Prtichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) *483 (en banc). In Michel v. Commissioner, 629 F.2d 1071, 1073 (5th Cir. 1980), affg. a Memorandum Opinion of this Court, the Fifth Circuit set forth the standard that "A taxpayer's home, for purposes of section 162(a)(2), means the vicinity of his principal place of employment and not where his personal residence is located, if such residence is located in a different place from his principal place of employment." The precedent in the Eleventh Circuit thus comports with the view of this Court (e.g., Horton v. Commissioner, 86 T.C. 589, 593 (1986)) and certain other circuits (e.g., the Eighth and Ninth, as set forth above in Ellwein v. United States, 778 F.2d 506, 509 (8th Cir. 1985), and Coombs v. Commissioner, 608 F.2d 1269, 1275-1276 (9th Cir. 1979), respectively). Accordingly, we must decide the location of petitioner's principal place of employment to ascertain his tax home. Petitioner argues that, because his TWA flights could originate from anywhere in the United States, and actually did originate from four different *484 cities during 1983, petitioner did not have a regular place of employment. Petitioner concludes that his tax home therefore was his condominium in the Bahamas and cites as support Rev. Rul. 71-247, 1971-1 C.B. 54. That revenue ruling held that a taxpayer's home for purposes of section 162(a)(2) was his residence, based on the following facts: [3]
[The taxpayer] receives his assignments and reassignment to various work locations from the regional office of his employer, but he does not travel to or from that office, nor does he live in the vicinity of the office. His work locations are only temporary and change frequently, and he has no way of knowing where future work assignments will be located. The taxpayer owns a house in City A where he lives when not away on work assignments, and where his wife and children reside at all times. City A is located in the twelve-state region where the taxpayer's work assignments occur. All of the work assignments require the taxpayer to be away from his abode at least long enough to necessitate his stopping for substantial sleep or rest. *485 We note first that a revenue ruling merely represents the Commissioner's position with respect to a specific set of facts; it is not precedential authority. Segel v. Commissioner, 89 T.C. 816, 847 (1987); Stark v. Commissioner, 86 T.C. 243, 250-251 (1986). Moreover, the facts relating to the taxpayer in that ruling, who was a salesman, are different from the facts relating to petitioner's employment as an airline pilot. Unlike that taxpayer, petitioner had a base station that is more than merely a headquarters for his supervisors. JFK was petitioner's base station, and, for every flight series petitioner would make, TWA took the responsibility upon itself to transport petitioner, if he desired, between JFK and any other airport where his flight series would end or begin. Thus, insofar as TWA was concerned, petitioner's responsibility merely was to report to his base station at JFK, after which TWA was responsible for getting him to any other airport from which his flight might begin. Similarly, at the end of a flight series, TWA also recognized in itself *486 a responsibility to return petitioner to his JFK base, unless, for whatever reason, petitioner absolved TWA of such responsibility. Such facts show that TWA obviously recognized and considered JFK in New York to be petitioner's base of employment. Based on that recognition, and because of petitioner's significant work ties to JFK during the year in issue (16 of his 20 flight series began and/or terminated at JFK), we find that petitioner's principle place of employment as an airplane pilot in 1983 was his base station, JFK in New York. See Folkman v. United States, 615 F.2d 493, 496 (9th Cir. 1980) (in case dealing with airline pilots having dual employers and places of employment, tax home held to be city of airline duty base). Accordingly, we find that petitioner's tax home was in the New York City vicinity, not in the Bahamas. We therefore hold that petitioner is not entitled to any foreign earned income exclusion under section 911 for 1983. On account of such holding, it is moot whether petitioner had an abode within the United States, and we need not address the issue. 2. EMPLOYEE EXPENSES We next must decide whether petitioner is entitled to employee *487 business expense deductions for amounts paid for lodging, bus fare, parking, and a paging service. Petitioner argues that he incurred such expenses while he was away from home and is entitled to a deduction under section 162. Petitioner testified that TWA paid him a per diem allowance that was to cover only food, lodging, and other expenses incurred between the beginning and termination of each flight series. The claimed deductions, on the other hand, relate to expenses for (1) hotels near airports in metropolitan New York City, (2) bus fares incurred in travelling from one airport to another, (3) parking in an airline employee parking lot in Florida, and (4) use of a paging service while petitioner was off-duty. Respondent stipulates that petitioner has adequately substantiated payment of the expenses at issue, but respondent contests deductions for such expenses on the grounds that the expenses were personal, not business, expenses and were not incurred while petitioner was away from his tax home. We agree, by and large, with respondent. We found above that petitioner's tax home was JFK near New York City. Thus, the hotel expenses were incurred in the vicinity of petitioner's *488 tax home. Section 162(a)(2) only allows a deduction for expenses, such as hotels, incurred by the taxpayer while away from home. Commissioner v. Flowers, 326 U.S. 465, 470 (1946). Although staying in a hotel the night before beginning a flight series might have allowed petitioner to be more relaxed and refreshed while on the job, he would not have incurred the hotel expenses if he had kept any residence in the vicinity of New York City. Petitioner's choice to maintain a residence far away from his principle place of business was a personal decision, and the additional living expenses incurred as a result of that choice, such as hotel expenses, are not deductible. Commissioner v. Flowers, supra; Tucker v. Commissioner, 55 T.C. 783, 786 (1971); Garlock v. Commissioner, 34 T.C. 611, 614 (1960); sec. 1.262-1(b)(5), Income Tax Regs.
With respect to the bus fares, the only evidence in the record is petitioner's testimony that such expenses were incurred for transportation between airports, *489 such as to get cross-town from LaGuardia airport to JFK. Thus, the only evidence in the record regarding the bus fares indicates that they were expenses for travelling in the New York City area -- again, in the vicinity of petitioner's tax home. When petitioner could not get flights into JFK from the Bahamas or his family's Florida home, he would fly into LaGuardia airport and then pay the bus fare to go from LaGuardia to JFK. As with the hotel expenses, we believe that petitioner would not have had inter-airport bus expenses if he had maintained a residence in the New York City area and that such expenses are personal and not deductible. Sec. 1.162-2(a), Income Tax Regs. Petitioner certainly has not proved otherwise, and we hold that petitioner is not entitled to any deduction for the bus fares. Rule 142(a). We note also that the bus fares may be considered simply a cost of petitioner's commuting to JFK from wherever he was before going to work, generally either Florida or the Bahamas. It is well settled that the taxpayer's cost of commuting to his place *490 of work is a nondeductible personal expense. Fausner v. Commissioner, 413 U.S. 838, 839 (1973); Commissioner v. Flowers, 326 U.S. at 473-474; secs. 1.262-1(b)(5), 1.162-2(e), Income Tax Regs. In that regard, we find the parking fees at the airport employee lot in Florida also are commuting expenses, and we therefore hold them to be nondeductible. Such expenses were no different from the parking costs any other employee would pay in driving a car to commute to his principle place of employment. That petitioner also rode a plane between parking his car and reaching his place of employment is immaterial. [4]
Petitioner also requests a deduction for a paging service. Petitioner testified that at times he was on call and TWA required him to *491 be available to answer the phone, and we accept such testimony. Given respondent's stipulation that petitioner has documentation to support the expense, we find that petitioner is entitled to a deduction for the paging service. 3. AIRPLANE EXPENSES We next decide whether petitioner is entitled to deductions relating to a Piper airplane he owned. Petitioner asserts that he used the Piper airplane in a business of giving flying lessons. Respondent contests the deductibility of any expenses relating to the plane on the grounds that the plane was not used in any activity engaged in for profit. Section 162 allows a deduction for all ordinary and necessary expenses paid or incurred in carrying on any trade or business. Section 212 allows as a deduction all the ordinary and necessary expenses paid or incurred for the production or collection of income. A taxpayer, in order to be entitled to deductions under section 162 or 212, must show that he engaged in an activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs. *492 ; Beck v. Commissioner, 85 T.C. 557, 569 (1985); Brannen v. Commissioner, 78 T.C. 471, 501 (1982), affd. 722 F.2d 695, 704 (11th Cir. 1984). Whether a taxpayer engaged in an activity with the requisite profit objective is an issue of fact to be resolved on the basis of all the surrounding facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Allen v. Commissioner, 72 T.C. 28, 34 (1979). In deciding whether a taxpayer engaged in an activity with the requisite profit objective, however, we give greater weight to objective facts than to the taxpayer's mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Petitioner bears the burden of proof on the issue of profit motive. Rule 142(a). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine factors, derived principally from *493 case law, to be considered in deciding whether an activity is engaged in for profit. Allen v. Commissioner, 72 T.C. at 33. Examination of those factors in the context of the instant case leads to the conclusion that petitioner did not engage in the airplane activity with the requisite profit objective during 1983. In 1983 petitioner took deductions relating to the plane in the amount of $ 7,613 and received no income whatsoever from the plane. Petitioner testified that, after he purchased the plane in April 1981, he earned approximately $ 300 and $ 1,000 in 1981 and 1982, respectively, in connection with the use of the plane. He also testified that expenses related to the plane in those years were about the same as in 1983, except that 1981 expenses would be proportionately lower because he owned the plane for only nine months in that year. Accepting petitioner's testimony as true, the results of petitioner's airplane activity through 1983 were that his expenses relating to the plane in every year had been several times greater than his income from the plane. Such a history of constant losses weighs against petitioner's airplane activity being engaged in with *494 a true profit objective. Sec. 1.183-2(b)(6) and (7), Income Tax Regs.
We think the manner in which petitioner carried on his airplane activity also militates against a finding of profit objective. See sec. 1.183-2(b)(1), Income Tax Regs. The extent of petitioner's advertising for his "business" in 1983 was an advertisement he put in the side window of the plane. He testified he also got business via word-of-mouth referrals from former customers. Such word-of-mouth referrals obviously were few in 1983, inasmuch as petitioner realized no income at all from the plane. That he relied only on "word-of-mouth" referrals and a sign in the plane, and not on any other form of advertisement, indicates to us that petitioner was not overly concerned with whether he acquired any significant number of customers. Section 1.183-2(b)(3), Income Tax Regs., lists as a factor the time and effort the taxpayer expends in carrying on the activity. In the instant case, we have seen no evidence to indicate that petitioner expended any significant time and effort on his airplane activity. There are no logs or other evidence that might indicate the *495 number of hours petitioner spent on the activity in any period, and petitioner's testimony was similarly unenlightening in this regard. The regulations also list as a factor whether elements of personal pleasure or recreation are involved in the activity. Sec. 1.183-2(b)(9), Income Tax Regs. Petitioner was a pilot by profession, and we infer that he likely derived some personal pleasure from flying the plane in issue. Moreover, petitioner's ownership of the plane made travel between the Freeport condo and his family's home in Florida, as well as other locations, much more convenient for him. In short, we find that petitioner was not engaged in the airplane activity with any actual profit objective or that he is otherwise entitled to any deductions for 1983 relating to the Piper aircraft. Accordingly, we hold that any costs relating to the airplane in 1983 are personal, nondeductible expenses. 4. SECTION 6653(a)
Respondent also determined that petitioners' entire underpayment of tax was subject to the additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules and regulations. Respondent's determination in *496 this regard is prima facie correct, and petitioners have the burden to prove they are not liable for the section 6653(a) addition. Rule 142(a); Scott v. Commissioner, 61 T.C. 654, 663 (1974). Petitioners assert that they took their position on the section 911 issue based on (1) respondent's earlier audit of petitioners' tax returns for the years 1974 through 1976, which allowed petitioners a foreign earned income exclusion; (2) the statements of "the people who do [petitioner's] taxes that if [petitioner] qualified for the exclusion before, [he] should have no problem qualifying again"; and (3) respondent's Publication 54 (Tax Guide for U.S. Citizens and Resident Aliens Abroad). Respondent asserts that the move of Mrs. Swicegood and the children to Florida in 1977 is a significant change of facts that precludes any reasonable reliance by petitioners on the results of the audit of the earlier years. In that regard, respondent's assertions arguably are corroborated by petitioner's actions, inasmuch as petitioner did not take any section 911 exclusion on his tax returns from 1977, the year Mrs. Swicegood and Angie moved and the first year not covered by respondent's *497 earlier audit, until the year in issue. Further, respondent correctly notes that the law changed between 1983 and the years involved in the earlier audit. Under section 911, as in effect for 1974 through 1976, allowance of a foreign earned income exclusion was based only on a taxpayer's residence or presence in a foreign country. By the year in issue, however, Congress had amended the provisions relating to the foreign earned income exclusion so as also to require a tax home in a foreign country and no abode within the United States. Sec. 911(d)(1) and (3), enacted by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 111(a), 95 Stat. 172. Thus, given the change in the law, reliance on petitioners' earlier audit does not adequately justify the position they took for 1983. Petitioners also assert that they relied on the advice of their tax return preparer, H&R Block. The record contains neither any testimony from an H&R Block representative nor any documentation from H&R Block that might show a reasoned analysis of petitioner's entitlement to any section 911 exclusion. For that matter, petitioner's testimony regarding H&R Block's advice is very terse and, in general, *498 unenlightening. Moreover, petitioners have not even shown that H&R Block gave any advice after being provided with all the relevant information. See Pritchett v. Commissioner, 63 T.C. 149, 174 (1974). In short, we find that petitioners have not proved that any advice given by H&R Block would relieve them from liability for the section 6653(a) addition to tax. Petitioners also discuss their reliance on Publication 54, but they have offered no copy of that publication into evidence. The only particular in the record with regard to that publication is a statement that "in Publication 54, there is a comment that says that if you have no regular or main place of business because of the nature of your work, then your tax home is the place you regularly live." We surmise that Publication 54 may have gone into greater depth on section 911 than that simple one-sentence statement, but petitioners have not offered adequate evidence to allay our concerns. For that matter, we cannot be positive from the record that the version of Publication 54 on which petitioners profess to have relied was one discussing the law as applicable in 1983, rather than an earlier year. In *499 short, we find that petitioners have not proved that their reliance on Publication 54 allows them to avoid the negligence addition. We accordingly find that petitioners have failed to prove that they are not liable for the negligence addition with respect to the underpayment attributable to the disallowed section 911 exclusion. As for the employee business expenses, those were all taken in reliance on petitioner's being considered to have a tax home outside of the United States. Based on our holding above, we also find that petitioners have failed to prove that they are not liable for the negligence addition with regard to the disallowed "employee" expenses. With regard to the airplane expenses, petitioners' briefs make no argument that the negligence addition should not apply, so we find that petitioners have conceded the issue. We therefore hold petitioners to be liable for the negligence addition on all items found in respondent's favor. 5. SECTION 6661
Respondent last contends that petitioners are liable for the addition to tax under section 6661 for a substantial understatement of tax. *500 Section 6661 provides for an addition to tax where a taxpayer's tax is understated by the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(a) and (b)(1)(A). Given our holdings above, petitioners meet the quantitative requirements for a substantial understatement. The section 6661 addition is inapplicable, however, if there is or was substantial authority for the taxpayer's treatment of the item(s) in issue (sec. 6661(b)(2)(B)(i)), or if the relevant facts relating to the tax treatment were adequately disclosed on the return (sec. 6661(b)(2)(B)(ii)). Antonides v. Commissioner, 91 T.C. 686, 701 (1988). Petitioners have the burden of proof on the section 6661 addition. Rule 142(a). Petitioners concede that they do not meet the adequate disclosure exception to section 6661, but they argue that they had substantial authority for their tax treatment of the items in issue. The only authority suggested by petitioners as grounds for relief from the section 6661 addition, however, is respondent's Publication 54. Assuming arguendo that respondent's publications do constitute authority on which a taxpayer may rely for relief under *501 the substantial authority exception to the section 6661 addition, petitioners have failed to prove the contents of Publication 54 and that it supports their position. We therefore find that petitioners fail to prove they had substantial authority for the positions taken on their tax return. Accordingly, we hold that petitioners are liable for the addition to tax under section 6661. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during 1983, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. For instance, petitioner suggested that Christmas cards sent to him at his Bahamian address had not arrived until the next June.↩
3. See also Rev. Rul. 75-432, 1975-2 C.B. 60↩, 61, which states, "In the rare case in which the employee has no identifiable principal place of business, but does maintain a regular place of abode in a real or substantial sense in a particular city from which the taxpayer is sent on temporary assignments, the tax home will be regarded as being that place of abode."
4. That petitioner supposedly paid to park his car in a Florida airport lot is incongruous with petitioner's implication, in regard to the section 911↩ issue, that he had only a Bahamian driver's license, and not one from Florida. We do not see why a non-licensed driver would have parking expenses in Florida, but the discrepancy in petitioner's statements is immaterial in light of our conclusions above.